**Jimmie D. OYLER, Petitioner–Appellant,**

v.

**Fred ALLENBRAND and the Attorney General of Kansas, Respondents–Appellees.**

No. 93–3192.

United States Court of Appeals, Tenth Circuit.

April 28, 1994.

Jimmie D. Oyler, pro se.

Robert T. Stephan, Kansas Atty. Gen., Timothy G. Madden, Special Asst. Atty. Gen., Department of Corrections, for respondent-appellee.

Before BRORBY and EBEL, Circuit Judges, and KANE,** District Judge.

EBEL, Circuit Judge.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.

Petitioner Jimmie D. Oyler, a Native American, appeals the district court's denial of his petition for writ of habeas corpus, alleging error in that court's conclusion that Kansas has criminal jurisdiction over him. He further contends that the cigarette tax laws of Kansas are regulatory and thus unenforceable against him, that the tax scheme violates his civil rights, and that he was denied his rights to a jury trial and to present certain evidence to the trial court. In denying the petition, the district court held that the Kansas Act, 18 U.S.C. § 3243, empowered the State of Kansas to exercise criminal jurisdiction over petitioner despite the contrary language of the Treaty with the Shawnee, 1831 (Shawnee Treaty). The district court also dismissed petitioner's civil rights claims as inappropriate for habeas relief. *Oyler v. Allenbrand,* 815 F.Supp. 1441, 1444 (D.Kan.1993). Because we agree with the legal conclusions reached by the district court regarding the scope of Kansas' criminal jurisdiction and petitioner's civil rights claims, we affirm that portion of the district court's order. We remand the remainder of the case, however, in order that the district

court may consider whether the additional claims raised by petitioner have been exhausted or are procedurally barred.

Petitioner, a Loyal Shawnee by roll and a tribal member of the Cherokee as a Cherokee Shawnee, operated a smokeshop on his restricted Indian allotment on land classified as "Indian country." *See* 18 U.S.C. § 1151.[1] During December 1989 and January 1990, agents from the Kansas Bureau of Investigation, working undercover, purchased cigarettes at petitioner's smokeshop. None of the cigarettes had Kansas tax stamps, the purchasers did not pay sales tax, and petitioner did not ask the agents if they were Indians. Petitioner was convicted of three counts of possessing more than two hundred cigarettes without the requisite tax stamp in violation of Kan.Stat.Ann. §§ 79–3321 and 79–3322, and three counts of the sale of cigarettes at retail that did not bear the Kansas tax stamp in violation of those same statutes. All of these offenses are misdemeanors. Petitioner was sentenced to 180 days in jail and fined $2,250.

Petitioner's conviction was upheld by the Kansas Court of Appeals. *State v. Oyler,* 15 Kan.App.2d 78, 803 P.2d 581 (1990). The Kansas Supreme Court denied review. In April 1991, before petitioner began to serve his sentence, he filed a petition for writ of habeas corpus in the United States District Court for the District of Kansas. Shortly thereafter, petitioner's sentence was modified to two years' probation and payment of the fine. He has now completed his probation.

We first address the issue of our habeas jurisdiction. *See McGeorge v. Continental Airlines, Inc.,* 871 F.2d 952, 953 (10th Cir.1989) (court has a duty to inquire into its own jurisdiction). The federal habeas statute requires a plaintiff to be in custody when a petition for habeas corpus is filed. *See* 28 U.S.C. § 2254(a). Here, petitioner filed his habeas petition while still on bond pending appeal, but before his sentence had been reduced to probation and before he began to serve that probation. We deem this filing to

** Honorable John L. Kane, Jr., Senior District Judge, United States District Court for the District of Colorado, sitting by designation.

1. Petitioner's allotment was patented in 1859 to petitioner's ancestors, Newton and Nancy McNeer, who were members of the Shawnee Nation.

have occurred while petitioner was "in custody." *See Hensley v. Municipal Ct.*, 411 U.S. 345, 345–46, 93 S.Ct. 1571, 1571–72, 36 L.Ed.2d 294 (1973) (person released on his own recognizance is "in custody" for purpose of habeas); *see also United States ex rel. Grundset v. Franzen*, 675 F.2d 870, 872 (7th Cir.1982) (custody requirement satisfied by person on bail pending final disposition of his case). "Once federal jurisdiction is thus established, plaintiff['s] subsequent release [has] no effect on that jurisdiction." *Nakell v. Attorney General*, 15 F.3d 319, 323 (4th Cir.1994).

■ That conclusion, however, does not completely resolve the jurisdictional inquiry. Because petitioner has now served all of his probation, a separate and distinct jurisdictional question arises involving the issue of mootness. "Generally, a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* at 322 (citing *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)) (internal quotes omitted). Mootness deprives a court of jurisdiction. *New Mexico Env't Dep't v. Foulston (In re L.F. Jennings Oil Co.)*, 4 F.3d 887, 888 (10th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). An exception to the mootness doctrine occurs, however, in instances where collateral consequences from a judicial decision give a party a sufficient stake in the outcome of the case. *Nakell*, 15 F.3d at 322.

In *Lane v. Williams*, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982), the Court noted with approval its earlier decisions holding that a criminal case is moot " 'only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction.' "

*Id.* at 632, 102 S.Ct. at 1327 (quoting *Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 1900, 20 L.Ed.2d 917 (1968)); *see also Walker v. McLain*, 768 F.2d 1181, 1183 (10th Cir.1985), *cert. denied*, 474 U.S. 1061, 106 S.Ct. 805, 88 L.Ed.2d 781 (1986). The Seventh Circuit applied the *Lane* standard in *Franzen* and held that the possibility of collateral consequences arising from a misdemeanor conviction, such as the chance that a later sentence might be enhanced because of an earlier misdemeanor conviction or that such a conviction could be used in some jurisdictions to impeach the petitioner in later proceedings, is sufficient to overcome mootness. *Franzen*, 675 F.2d at 873. Thus, the fact that petitioner was only convicted of misdemeanors will not, by itself, render his case moot.[2]

Because petitioner's application for habeas relief was filed while petitioner was in custody, and because possible adverse collateral consequences could flow from petitioner's conviction, we find we have jurisdiction over this case and petitioner's appeal is not moot. *See Olson v. Hart*, 965 F.2d 940, 942–43 (10th Cir.1992).

Turning to the merits, petitioner argues that Kansas had no criminal jurisdiction over him because of the rights he claims from the Shawnee Treaty and, derivatively, from the Cherokee Treaty of 1835.[3] The district court, however, held that the Kansas Act, 18 U.S.C. § 3243, gave Kansas criminal jurisdiction over petitioner, despite the provisions of the Shawnee Treaty. *Oyler*, 815 F.Supp. at 1443–44. We review the district court's statutory interpretation de novo. *Negonsott v. Samuels*, 933 F.2d 818, 819 (10th Cir.1991), *aff'd*, — U.S. —, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993).

■ Article X of the Shawnee Treaty pledged that the Shawnee lands would never

---

**2.** Additionally, the Fourth Circuit has held that a petitioner's interest in the possible return of a fine constitutes a collateral consequence sufficient to defeat mootness. *Nakell*, 15 F.3d at 322.

**3.** *See* Treaty of New Echota (also known as Treaty with the Cherokee, 1835) 7 Stat. 478 (1835). That treaty, entered into between the United States and the Cherokee Nation, similarly guarantees the Cherokee, and any persons connected with them, freedom from state jurisdiction. In

1869, the Loyal Band of Shawnee joined with the Cherokee and assumed all rights of the Cherokee Nation, including, presumably, the benefits of the Cherokee Treaty of 1835. There is no evidence, however, that the 1869 merger of the Shawnee and the Cherokee altered any rights vested under previous Shawnee treaties. For purposes of our analysis, therefore, we will refer only to the Shawnee Treaty.

be within the bounds of any state or subject to state law.[4] We have found no evidence that this treaty has ever been formally abrogated. In 1940, however, Congress enacted 18 U.S.C. § 3243, the Kansas Act. That Act provides in full:

> Jurisdiction is conferred on the State of Kansas over offenses committed by or against Indians on Indian reservations, including trust or restricted allotments, within the State of Kansas, to the same extent as its courts have jurisdiction over offenses committed elsewhere within the State in accordance with the laws of the State.
>
> This section shall not deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on Indian reservations.

Act of June 25, 1948, ch. 645, 62 Stat. 827 (1948). *Based on* Act of June 8, 1940, ch. 276, 54 Stat. 249 (codified at 18 U.S.C. § 3243). This case requires us to determine the effect of the Kansas Act on the Shawnee Treaty.[5]

Petitioner argues that the Kansas Act does not apply to him but, instead, applies only to the four federally recognized Kansas tribes who were living on reservations in Kansas at the time the Act became law. Those tribes are the Iowa, Kickapoo, Potawatomi, and Sac and Fox (Original Tribes). Further, because he is a Shawnee and an heir to the promises of the Shawnee Treaty, petitioner argues that Kansas cannot exercise criminal jurisdiction over him in the absence of clear congressional intent to abrogate the Treaty.

4. Article X of the treaty provides:
   The lands granted by this agreement and convention to the said band or tribe of Shawnees, shall not be sold nor ceded by them, except to the United States. And the United States guarantee that said lands shall never be within the bounds of any State or territory, nor subject to the laws thereof; and further, that the President of the United States will cause said tribe to be protected at their intended residence, against all interruption or disturbance from any other tribe or nation of Indians, or from any other person or persons whatever, and he shall have the same care and superintendence over them, in the country to which they are to remove, that he has heretofore had over them at their present place of residence.

The Supreme Court has recently held that the Kansas Act, "[s]tanding alone, ... unambiguously confers jurisdiction on Kansas to prosecute all offenses—major and minor—committed by or against Indians on Indian reservations in accordance with state law." *Negonsott v. Samuels,* —— U.S. ——, ——, 113 S.Ct. 1119, 1123, 122 L.Ed.2d 457 (1993). The respondents would have us simply apply the Supreme Court's holding in *Negonsott* and conclude that the Kansas Act also applies to petitioner. We think, however, that this case presents issues different from those considered in *Negonsott* and requires further analysis.

In *Negonsott,* the Supreme Court examined the interrelationship between the Indian Major Crimes Act, 18 U.S.C. § 1153, and the Kansas Act. Whether the Act applied to Indians not members of the Original Tribes was not an issue because the petitioner in *Negonsott* was a Kickapoo. Additionally, *Negonsott* presented no issue of treaty abrogation. So, while *Negonsott* provides guidance as to the legislative history of the Kansas Act and general congressional intent, it does not completely resolve the case before us. Here, we are called upon to decide whether an Indian who is not a member of one of the Original Tribes is subject to the Kansas Act, and if so, whether in passing the Act, Congress intended to abrogate the Shawnee Treaty.

There is no indication from the face of the Act that its scope is limited only to the Original Tribes. The language of the Act is inclusive. It grants criminal jurisdiction to the State of Kansas over offenses committed

Treaty with the Shawnee, 1831, 7 Stat. 355; R.Vol. II at 31.

5. We acknowledge the Supreme Court's conclusion in *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), that a State could require "Indian retailers doing business on tribal reservations to collect a state-imposed cigarette tax on their sales to nonmembers of the Tribe." *Id.* at 513, 111 S.Ct. at 911. We note, however, that *Potawatomi* involved civil penalties, as opposed to the criminal liability faced here by petitioner, and further that petitioner claims a treaty right which guarantees him freedom from any state jurisdiction, criminal or civil.

by or against Indians. This reference to Indians is without restriction based on tribal affiliation, and no mention is made of the Original Tribes by name. The Act's geographic scope is equally broad, applying to "Indians on Indian reservations, including trust or restricted allotments, within the State of Kansas." 18 U.S.C. § 3243. Nevertheless, even with this unambiguous language, there is no express statement in the legislation of congressional intent to abrogate the Shawnee Treaty.

Before we will conclude that Congress, in the absence of explicit statement, intended to abrogate a treaty right, we must have "clear evidence that [it] actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty." *United States v. Dion,* 476 U.S. 734, 740, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767 (1986). Congressional intent to abrogate treaty rights will not be lightly inferred; such purpose must be "clear and plain." *Id.* at 738, 106 S.Ct. at 2220. Where, however, "the evidence of congressional intent to abrogate is sufficiently compelling, 'the weight of authority indicates that such an intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute.'" *Id.* at 739, 106 S.Ct. at 2220 (quoting F. Cohen, Handbook of Federal Indian Law 449 (1982)).

The bulk of the legislative history of the Kansas Act is contained in a letter from the Act's sponsor, Rep. W.P. Lambertson of Kansas, and a letter and memorandum from then Acting Secretary of the Interior, E.K. Burlew, to the Chairmen of the House and Senate Indian Affairs Committees. S.Rep. No. 1523, 76th Cong., 3d Sess. (1940); H.R.Rep. No. 1999, 76th Cong., 3d Sess. (1940) (hereafter H.R.Rep. No. 1999). That history refers in several places to the four federally recognized tribes living in Kansas in 1940, although never specifically by name. After discussing limits in the relevant federal criminal statutes and the need for resort to tribal courts, Mr. Burlew noted:

In the case of the four Kansas reservations, however, no tribal courts have existed for many years, and the Indians do not desire their reestablishment at this late date. With the approbation of the tribes concerned, the State courts of Kansas have in the past undertaken the trial and punishment of offenses committed on these reservations, including those covered by Federal statutes.

H.R.Rep. No. 1999 at 2. The letter further states that "the tribes concerned desire the authorization and continuance of the criminal jurisdiction hitherto exercised by the State courts." *Id.* The memorandum accompanying Acting Secretary Burlew's letter again notes the absence of tribal courts on the "four Indian reservations in Kansas." *Id.* at 4. It also discusses the breakup of reservations through the granting of allotments, tying the acreage amounts to the reservations of the four Kansas tribes. *Id.* Further, the memorandum notes "[t]he tribal councils of all four tribes have gone on record in favor of a transfer of jurisdiction in criminal matters to the State, and the superintendent in charge of the Kansas reservations also recommends that this action be taken." *Id.*

There are other references in the history, however, to Indians in general without restriction to the members of the Original Tribes. The letter from the bill's sponsor represents that all agree on the legislation: "the Indians, the superintendent, the Indian agencies on the Kansas reservations, which are all in my district, and the people that are on and surround the reservations." *Id.* at 1–2. Reference to "people that are on and surround the reservations" could include Indians other than those members of the Original Tribes. Mr. Lambertson summarized the bill as "relinquish[ing] to the State full jurisdiction over the Indians for small offenses." *Id.* Acting Secretary Burlew's letter notes that

"[t]he Federal criminal statutes applicable to Indian reservations are limited in their scope, particularly with respect to injuries inflicted by one Indian upon the person or property of another Indian.... As the authority of the several States over wrongful or illicit acts committed upon tribal or restricted Indian lands extends in the main only to situations where both the offender and the victim are white men, the mainte-

nance of law and order within Indian reservations is largely dependent upon tribal law and tribal courts.

*Id.* at 2. The memorandum accompanying Mr. Burlew's letter, details the variety of situations intended to be covered by the legislation: crimes, other than major crimes, committed by Indians against Indians, and offenses committed by Indians against white men or by white men against Indians. *Id.* at 3. There is no restriction as to the tribal status of these Indians.

As with all legal interpretation, we read the legislative history of the Kansas Act as a whole in an attempt to discern the intent of Congress in enacting this legislation. Two themes emerge: the lack of tribal courts, which created a vacuum in terms of some aspects of criminal jurisdiction, and the patchwork quality of the land holdings which resulted in conflicting, confusing and, in some instances, the complete absence of criminal jurisdiction for some offenses. We conclude that, because these were the two major problems Congress attempted to redress with the passage of the Kansas Act, that Act applies to petitioner.[6]

We acknowledge that the legislative history specifically refers to the four tribes and their lack of tribal courts. There is also reference to the fact that the tribes do not wish the tribal courts to be reestablished. We have no evidence, however, that the Shawnee or the Cherokee had a court system in place in 1940 which would make the application of this rationale to them improper. We do note that petitioner's counsel in the Kansas district court represented that the Cherokee "always had tribal courts." R. Vol. II, Tr. of Proceedings, March 5, 1990, in Dist.Ct. of Johnson County, Kan., at 9. While this may not be accurate,[7] we note that the presence of tribal courts would not have completely obviated the need for the Kansas Act or dictated a conclusion that the Act does not apply to the Shawnee. The memorandum from Mr. Burlew states:

> Reestablishment of the tribal courts would largely meet the difficulties resulting from the absence of a comprehensive Federal code of Indian offenses, but it would not meet all the difficulties involved, since tribal courts have jurisdiction only over Indians and may not punish white men for offenses committed upon Indians.

Thus, even if the Shawnee/Cherokee had functioning tribal courts, that fact would not necessarily mean that Congress did not intend the Kansas Act to apply to them.

The second concern evidenced in the legislative history was the fact that "the checkerboard pattern of the land technically subject to Federal jurisdiction makes other arrangements difficult of administration." *Id.* at 2. This situation was the result of the issuance of unrestricted patents for most of the allotted lands. *Id.* Federal statutes applying to Indian reservations were limited in scope; state authority upon tribal or restricted Indian lands extended mainly "only to situations where both the offender and the victim are white men. . . . Federal jurisdiction in criminal matters [extended] for the most part only to tribal and restricted lands." *Id.* Petitioner's land, while not included in one of the four reservations, was and is a restricted allotment.

---

6. However, we note respondents provided no evidence that these conditions affected the Shawnee/Cherokee or that Congress considered the Shawnee/Cherokee when it passed the Act.

7. The Curtis Act, ch. 517, § 28, 30 Stat. 495, 504–05 (1898), abolished all tribal courts in Indian Territory, and the Agreement with the Cherokee Nation, April 1, 1900, made it clear that nothing in the latter Act should be "construed to revive or reestablish the Cherokee courts abolished by [the Curtis Act]." Appendix to Cherokee Nation Code, doc. 27 at ¶ 72. In 1936, however, Congress "enacted legislation designed to restore governmental powers to the Oklahoma tribes [which would include the Cherokee]." *Indian Country, U.S.A., Inc. v. Oklahoma ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 981 (10th Cir.1987) (citing Oklahoma Indian Welfare Act, ch. 831, 49 Stat. 1967 (1936) (codified as amended at 25 U.S.C. §§ 501–509 (1982)), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988). Because the Cherokee may have taken advantage of this latter legislation to reestablish tribal courts by 1940, and because we cannot discern from the record whether if such courts existed they would have served the Shawnee/Cherokee living in Kansas, we cannot determine whether the Shawnee had a functioning court system in Kansas in 1940.

■ We discern from this history an intent by Congress to "clean up" the jurisdictional maze that had developed in Kansas by 1940 with regard to criminal matters involving Indians. The vehicle Congress chose to implement this new beginning was the Kansas Act. Because surrounding circumstances can be considered in discerning the intent of statutory provisions, *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208 n. 17, 98 S.Ct. 1011, 1020 n. 17, 55 L.Ed.2d 209 (1978), and because petitioner's allotment was one of those restricted allotments contributing to the uneven application of criminal jurisdiction in Kansas, we view the passage of the Kansas Act as unambiguous evidence of congressional intent to extend state criminal jurisdiction over petitioner. We hold, therefore, that the Kansas Act confers criminal jurisdiction on the State of Kansas over all Indians in Kansas, not just those members of the Original Tribes. This conclusion, of course, subsumes within it our further conclusion that Congress, in enacting the Kansas Act, intended to abrogate certain rights arising from the Shawnee Treaty.

In addition to reliance on legislative history, recent Supreme Court cases indicate that evidence of congressional intent to abrogate a treaty can come from a consideration of the interplay between the legislation at issue and the treaty involved. In *Dion,* 476 U.S. 734, 106 S.Ct. 2216, the Court addressed whether the Endangered Species Act and the Eagle Protection Act abrogated traditional Indian hunting rights. In so doing, the Court concluded that

> [c]ongressional intent to abrogate Indian treaty rights to hunt bald and golden eagles is certainly strongly suggested on the face of the Eagle Protection Act. The provision allowing taking of eagles under permit for the religious purposes of Indian tribes is difficult to explain except as a reflection of an understanding that the statute otherwise bans the taking of eagles by Indians.

*Id.* at 740, 106 S.Ct. at 2221. Thus, the Court held that the statute had abrogated the treaty right. *Id.* at 745, 106 S.Ct. at 2223.

More recently, in *South Dakota v. Bourland,* —— U.S. ——, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993), the Court has taken the same analytical approach in determining whether the Flood Control Act of 1944, ch. 665, 58 Stat. 887, and the Cheyenne River Act of Sept. 3, 1954, 68 Stat. 1191, abrogated that portion of the Fort Laramie Treaty of 1868, 15 Stat. 635, which had guaranteed the Sioux Tribes that their land would be held for the " 'absolute and undisturbed use and occupation' " of the Sioux and that no non-Indians would " 'ever be permitted to pass over, settle upon, or reside in' " the reservation. *Bourland,* at ——, 113 S.Ct. at 2313.

In analyzing this issue, the Court cited the *Dion* standard requiring " 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.' " *Id.* at ——, 113 S.Ct. at 2319 (quoting *Dion,* 476 U.S. at 740, 106 S.Ct. at 2220). Again, as in *Dion,* that standard was satisfied when the Court determined that portions of the legislation at issue could only be explained by concluding that Congress had intended to abrogate a treaty right.

Section 10 of the Cheyenne River Act had reserved certain rights to the Indians to access the taken lands and to hunt and fish, " 'subject ... to regulations governing the corresponding use by other citizens of the United States' " *Bourland,* —— U.S. at ——, 113 S.Ct. at 2317; Cheyenne River Act of Sept. 3, 1954, § 10, 68 Stat. 1191. Section 4 of the Flood Control Act provided that the land taken for the flood control projects would be " 'open to public use generally.' " *Id.* at ——, 113 S.Ct. at 2317 (quoting 16 U.S.C. § 460(d)). The Court concluded that "we cannot explain § 10 of the Cheyenne River Act and § 4 of the Flood Control Act except as indications that Congress sought to divest the Tribe of its right to 'absolute and undisturbed use and occupation' of the taken area." *Id.* at ——, 113 S.Ct. at 2319. The Court further determined the broad authority given the Secretary of the Army to manage the land in question was explicit evidence that Congress considered the possibility that its action would deprive the tribe of a previ-

ously held right. *Id.* at —— n. 13, 113 S.Ct. at 2318 n. 13.

Applying the *Dion/Bourland* analysis to this case, it is clear that in passing the Kansas Act Congress intended to abrogate the right of the Shawnee and other Indians residing in Kansas to be free from the criminal laws of the State. The language of the Act is sweeping: "Jurisdiction is conferred on the State of Kansas over offenses committed by or against Indians on Indian reservations, including trust or restricted allotments, within the State of Kansas[.]" 18 U.S.C. § 3243. As discussed above, the Act does not limit its application to only those Indians living on the four Kansas reservations.

Congress clearly has the power to abrogate an Indian treaty. However, " 'such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so.' " *Dion*, 476 U.S. at 738, 106 S.Ct. 2216 (quoting *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903)). Given the fact that, by 1940, tribal courts had ceased to function in Kansas, at least on the four Kansas reservations, and there existed a patchwork quilt of different Indian-related jurisdictions, passage of the Kansas Act represented an exercise of the congressional power of abrogation in circumstances that justified disregard of the treaty stipulations and, indeed, demanded, in the interest of the country and the Indians themselves, that the treaty right be set aside. *See Dion*, 476 U.S. at 738, 106 S.Ct. at 2219–2220.

We conclude that the Kansas Act reflected an explicit legislative policy choice that all Indians in Kansas, not merely those members of the Original Tribes, be subject to the criminal jurisdiction of the State. While we do not find treaty abrogation lightly, we nonetheless read the Kansas Act as having abrogated the portions of the Shawnee Treaty providing the right to be free from state criminal law. Kansas, therefore, has the power to exercise criminal jurisdiction over petitioner.

■ Petitioner's second ground for relief states that "[f]ailure of the State of Kansas to abide by the Treaty of 1831 with the Shawnees violates petitioner's civil rights pursuant to 42 U.S.C. section 1983." R.Doc. 1 at 8. The district court correctly dismissed this claim as inappropriate in a petition for habeas corpus. *See Preiser v. Rodriguez*, 411 U.S. 475, 494, 93 S.Ct. 1827, 1838–1839, 36 L.Ed.2d 439 (1973) (damages claims not cognizable under habeas statute because they do not seek immediate or more speedy release). Claims grounded in § 1983 are properly brought under that statute and not under 28 U.S.C. § 2254(a).

Petitioner's remaining two contentions [8] are that the tax imposed on him by the State of Kansas is regulatory in nature and thus unenforceable as to him under the rationale of *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987),[9] and that he was impermissibly denied his right to trial by jury. Petitioner first raised these issues to the district court in an amended motion to reconsider, which the district court denied. Because the district court considered these is-

---

8. Because petitioner never raised the issue of the Kansas trial court's failure to consider relevant evidence in the district court, that issue will not be considered for the first time on appeal. *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 720 (10th Cir.1993) (citing *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976)).

9. In *Cabazon Band*, the Court endorsed the Ninth Circuit's distinction between state criminal/prohibitory laws and state civil/regulatory laws. "[I]f the intent of a state law is generally to prohibit certain conduct, it falls within Pub.L.

280's grant of criminal jurisdiction, but if the state law generally permits the conduct at issue, subject to regulation, it must be classified as civil/regulatory and Pub.L. 280 does not authorize its enforcement on an Indian reservation. The shorthand test is whether the conduct at issue violates the State's public policy." *Cabazon Band*, 480 U.S. at 209, 107 S.Ct. at 1088. We view petitioner's argument that Kansas is attempting to bootstrap a civil regulation on to a criminal law to gain jurisdiction over him to be contained within this issue. We express no opinion on the possible merit of this claim.

sues and ruled on them, we will entertain them on appeal.[10]

 Respondents argue that the issue of petitioner's right to a jury trial was never raised in the state courts. We are similarly unable to determine whether petitioner ever raised his argument regarding the regulatory nature of the tax in state courts. The substance of a habeas petitioner's federal claims must be fairly presented to the state courts before they can be raised in federal court, *see Picard v. Connor*, 404 U.S. 270, 275, 278, 92 S.Ct. 509, 512, 513–514, 30 L.Ed.2d 438 (1971), and petitioner bears the burden of demonstrating that he has exhausted his available state remedies, *Miranda v. Cooper*, 967 F.2d 392, 398 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 347, 121 L.Ed.2d 262 (1992). Because we are unable to determine from the record before us whether petitioner has exhausted his state remedies, we remand this case to the district court for further consideration of this issue.

We note also the possibility that the state courts may have refused to address these claims because of some failure on petitioner's part to adhere to state procedural requirements. If so, and if such procedural default is based on an independent and adequate state procedural rule, federal habeas review of these issues is barred unless petitioner can show "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). On remand, the district court should consider whether petitioner's jury trial claim and/or his argument based on the regulatory/prohibitory dichotomy are exhausted or are subject to procedural bar.

The judgment of the United States District Court for the District of Kansas is AF-FIRMED in part and REVERSED in part; this case is REMANDED to the district court for further consideration consistent with this opinion.

---

**10.** While a motion to reconsider is generally not the proper vehicle by which to raise new grounds for relief, *see United States v. Ibarra*, 920 F.2d 702, 706 n. 3 (10th Cir.1990), *vacated on other grounds*, —— U.S. ——, 112 S.Ct. 4, 116 L.Ed.2d 1 (1991), in this case, the district court reviewed the motion, considered the accompanying supplemental material, and ruled on the issues raised. R.Vol. I, doc. 27. Thus, consideration of these claims on appeal is proper. *Cf. Burnette v. Dresser Indus., Inc.*, 849 F.2d 1277, 1285 (10th Cir.1988) (claim raised for the first time in motion for reconsideration and not considered or ruled on by the district court not addressed on appeal).