No. 71,258

IN THE MATTER OF THE APPLICATION OF OYLER, JIMMIE D.,
FOR EXEMPTION FROM AD VALOREM TAXATION IN JOHNSON
COUNTY, KANSAS, and IN THE MATTER OF THE PROTESTS OF
OYLER, JIMMIE D., FOR TAXES PAID FOR 1990, 1991, AND
1992 IN JOHNSON COUNTY, KANSAS.

(887 P.2d 81)

Opinion filed December 16, 1994.

*Robert A. Ford*, assistant county counselor, argued the cause, and *Lisa R. Wetzler*, assistant county counselor, was with him on the brief for appellant.

*Pamela S. Fahey*, of Oneida, New York, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a personal property tax exemption case arising from the taxpayer's claim under Native American treaty rights. Jimmie D. Oyler claims an exemption from state motor vehicle taxes based on his Shawnee Indian heritage and the status of the Johnson County property where he resides. The Board of Tax Appeals (BOTA) found that Oyler was "Indian" and that he resided on "Indian country." Oyler's exemption was denied because: (1) he was not an "Indian residing on an Indian reservation," and (2) the Shawnee Indians' treaty rights under an 1831 treaty with the United States—on which Oyler relied to support his claimed exemption—were extinguished in 1869 when the Shawnee voluntarily incorporated into the Cherokee Nation.

Oyler sought judicial review under the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601

*et seq.* The district court, relying in part on federal case law decided after BOTA's decision, granted the tax exemption. The Board of County Commissioners of Johnson County (the County) appeals.

Our jurisdiction is under K.S.A. 20-3018(c) (a transfer from Court of Appeals on our motion).

The issue is whether the district court correctly reversed BOTA in granting Oyler's requested exemptions from Kansas' personal property tax on the basis of treaty rights established between the Shawnee Indians and the United States.

BOTA orders are subject to judicial review. K.S.A. 74-2426(c). Our standard of review is statutorily defined by the KJRA. K.S.A. 77-623 provides that agency actions are reviewable by appellate courts as in other civil cases. K.S.A. 77-621(c) lists the criteria for district court review. We exercise the same standard of review of BOTA's action as does the district court. *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 456, 807 P.2d 652 (1991).

The United States Supreme Court decided a significant Native American taxation case between the date of BOTA's decision and the decision of the district court. *Oklahoma Tax Com. v. Sac & Fox Nation*, 508 U.S. ___, 124 L. Ed. 2d 30, 113 S. Ct. 1985 (1993). Although the district court had the benefit of the *Sac & Fox* opinion and relied on it in reversing BOTA, we read *Sac & Fox* more narrowly than did the district court. Under *Sac & Fox*, an Indian who lives in Indian country will in most cases be entitled to a presumption of immunity from state taxing jurisdiction. If, however, there is no showing that a particular Indian's tribe exercises jurisdiction or sovereignty over that Indian and the Indian country on which he or she resides, then no such presumption arises.

We reverse the district court and remand to BOTA for further proceedings in conformity with our opinion. See K.S.A. 77-622(b).

### Facts

Oyler initiated the instant action by filing: (1) an application for ad valorem tax exemption on all of his vehicles for the years

1986 forward and (2) separate tax protest applications for the years 1989, 1990, 1991, and 1992, requesting refunds for property taxes paid on the vehicles.

Oyler, age 62, lives with his wife and son on Cedar Creek Road in western Johnson County. He has lived at this address since 1975, when he retired from the military.

The land on which Oyler and his family reside is registered in the name of the Bureau of Indian Affairs (BIA) because it is within a 94-acre federally restricted allotment known as Shawnee Reserve 206. Oyler owns an interest—the precise nature of which is unclear from the record—in a portion of the 94-acre allotment. The size of his property within the restricted allotment is also unclear from the record. (Counsel for the County indicated three acres during oral argument.) Oyler does not pay, nor has the County ever attempted to collect, property taxes on his real property. The ambiguity regarding Oyler's ownership interest in Shawnee Reserve 206 does not appear to be the fault of either party in establishing a record. His interest is simply unsettled. The County noted the "unsettled title situation," which has resulted in a partition action pending in federal court.

Oyler owns four vehicles—three cars (a 1972 Ford, a 1978 Chevrolet, and a 1989 Ford Crown Victoria) and one pickup truck (a 1985 Ford)—all of which he keeps at his residence on Shawnee Reserve 206, except when in use. BOTA made no findings on how much Oyler uses each vehicle or where such use predominately occurs. A BOTA commissioner asked Oyler at the hearing before the Board: "[Are] the cars . . . being used for personal use?" Oyler replied, "Just personal use on the property, ma'am, and whenever we go any place else or use them." Counsel for the County argued before BOTA that "[t]hese vehicles are simply used as personal use just like the rest of us do to go to the grocery store, to go to work or whatever personal uses." Oyler does not dispute the County's statement about his use of the vehicles. Oyler seeks a complete tax exemption on all four vehicles.

## Shawnee Reserve 206

Based on a letter from the Superintendent of the Horton, Kan-

sas, Agency Office of the BIA, BOTA found that Oyler resides on a restricted allotment created by an 1854 treaty between the United States and the Shawnee Indians. BOTA concluded that Oyler resides on Indian country as defined in 18 U.S.C. § 1151 (1988). Shawnee Reserve 206 has been described as a restricted Indian allotment in previous cases involving Oyler. *State v. Oyler*, 15 Kan. App. 2d 78, 81, 803 P.2d 581 (1990) (direct appeal from conviction for failure to comply with state cigarette tax laws), *rev. denied* 248 Kan. 998 (1991); *Oyler v. Allenbrand*, 23 F.3d 292, 293 (10th Cir. 1994) (federal habeas corpus appeal from state conviction for failure to comply with cigarette tax laws). The County concedes that Oyler lives on Indian country. (The status of Shawnee Reserve 206 as Indian country is not at issue.)

The Horton Agency Superintendent's letter described the 94 acres of Shawnee Reserve 206 and its history as follows:

"The property is described as the N2 SE4 and 14 acres off the South side of SE4 NE4 of Section 25, Township 12 South, Range 22 East of the 6th P.M., Johnson County, Kansas, containing 94 acres, more or less, and being part of the original allotment of Newton McNeer, deceased Shawnee allottee No. 206.

"These lands are located within the boundaries of the 200,000 acres of land in Kansas ceded to the Shawnee Tribe of Indians for selection of allotments in accordance with the provisions of the Treaty of May 10, 1854 (10 Stat., 1054). In this particular instance, Congress provided for the issuance of Patents to the lands by the Act of March 3, 1859 (11 Stat., 425), Section 11, and the same was issued to Newton and Nancy McNeer with the specific provision that the property 'shall never be sold or conveyed' by the grantee or his heirs, 'without the consent of the Secretary of the Interior for the time being', thereby imposing a restricted fee title which now rests in the heirs of the allottees, subject to the jurisdiction of the Secretary of the Interior regarding alienation or encumbrance."

Oyler claims to be the great, great, great-grandson of Newton McNeer, the Shawnee Indian identified in the BIA letter as the recipient of a 200-acre allotment. Ninety-four acres remain today as Shawnee Reserve 206. He therefore claims to have acquired his interest in the allotment through heirship. BOTA made no specific findings with respect to either how Oyler acquired his Shawnee Reserve 206 interest or the extent of such interest.

### Oyler's Status as an Indian

Oyler has a card issued by the BIA certifying that he is 1/32

degree Indian blood of the "Cherokee-Shawnee NE" Tribe. He also has a card certifying that he is a registered member of the Cherokee Nation. On the basis of this evidence, BOTA found Oyler to be "an enrolled member of a federally-recognized Indian tribe" and therefore concluded that he was an Indian under federal law. The County does not challenge Oyler's Indian status on appeal. The County sidesteps the Indian status issue, framing its argument before us as follows: "[E]ven if Mr. Oyler is an 'Indian' as defined by federal law, and even if he lives on 'Indian Country,' there still must be a viable tribal government which exercises governmental control over the land and the tribal members."

We accept BOTA's finding and the district court's concurrence that Oyler is an Indian for the purposes of this case by virtue of the evidence in the record of his enrollment in a federally recognized Indian tribe (Cherokee Nation) as a Cherokee-Shawnee.

## BOTA's Decision

BOTA issued a consolidated ruling, denying Oyler's protests and exemption requests. BOTA placed the burden of establishing the proposed tax exemption on Oyler, citing *Lutheran Home, Inc. v. Board of County Commissioners*, 211 Kan. 270, 275, 505 P.2d 1118 (1973). BOTA then noted past decisions which held that states lack jurisdiction to collect personal property taxes from *Indians residing on an Indian reservation. Bryan v. Itasca County*, 426 U.S. 373, 48 L. Ed. 2d 710, 96 S. Ct. 2102 (1976); *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 48 L. Ed. 2d 96, 96 S. Ct. 1634 (1976).

"However," the BOTA ruling continued, "the Board find[s] evidence in the record which casts doubt regarding the present status of the Shawnee Indian Tribe in Kansas and thus the validity of the cited treaties." The treaties in question were the treaties of 1831 and 1854 between the Shawnee and the United States. Oyler relied on these treaties to support his claimed tax exemption. The "evidence" casting doubt, in BOTA's view, on the validity of these treaties was the following discussion of the status of the Shawnee Tribe by the Kansas Court of Appeals in Oyler's direct appeal from his cigarette tax conviction:

"By 1940, the United States Department of the Interior only recognized four tribes on Kansas reservations. The four federally recognized Indian reservations in Kansas are the Iowa, Kickapoo, Potawatomi, and Sac and Fox. The Confederation of American Indians, *Indian Reservations: A State and Federal Handbook*, pp. 91-96 (1986). The Shawnee are not federally recognized in Kansas. In 1869, the Shawnee were incorporated by the Cherokee Nation, agreed to abandon their tribal organization, and were relocated in Oklahoma. Agreement between Shawnee and Cherokee, June 9, 1869." *State v. Oyler*, 15 Kan. App. 2d at 82.

BOTA cited *The Kansas Indians*, 72 U.S. (5 Wall.) 737, 18 L. Ed. 667 (1867), which held that the 1831 and 1854 treaties were enforceable to prevent Kansas from collecting property taxes from Shawnees on their 200-acre allotments. In *The Kansas Indians*, the Supreme Court added that the Shawnee's tax immunity "can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization." 72 U.S. (5 Wall.) at 757. On the basis of that statement, BOTA concluded as a matter of law that "the Shawnee's abandonment of their tribal organization in Kansas would logically terminate any treaty rights the tribe may once have had." BOTA added that, "[b]ased on the foregoing," it did not find Oyler to be either an "Indian residing on an Indian reservation," or that "the subject property is outside of the State's jurisdiction pursuant to the Admissions Act of the Kansas Constitution."

### District Court's Decision

The district court viewed BOTA's rejection of the exemption as resting on two independent grounds: (1) Oyler was not an "Indian residing on an Indian reservation," and thus he failed to come within what BOTA believed to be the test under prior U.S. Supreme Court cases, and (2) the 1831 and 1854 treaties upon which Oyler relied were invalidated as foreseen in *The Kansas Indians* when the Shawnee, in 1869, "voluntar[ily] abandoned their tribal organization" and incorporated or merged with the Cherokee Nation in Oklahoma. The district court disagreed with BOTA on both grounds.

The court first noted that Oyler "is a Shawnee Cherokee" and "an enrolled member of a federally recognized Indian tribe."

Oyler testified before BOTA that "Shawnee-Cherokee" and "Cherokee-Shawnee" are the same thing; the term preferred depends on one's ancestry. The district court further concurred in BOTA's finding that Oyler lives in " 'Indian country' on a restricted allotment . . . created in 1854 by treaty between the United States and the Shawnee Indians, for the purpose of granting land to individual Indians."

The district court then acknowledged the significance of *Sac & Fox*, reasoning that BOTA erred in (1) placing the burden on Oyler to establish the property tax exemption and (2) viewing whether Oyler was an "Indian residing on an Indian reservation" as the determinative question. After *Sac & Fox*, the district court explained, "[T]he more correct question to ask would be: is the plaintiff an Indian residing in Indian country?" The court concluded that BOTA's findings answered that question in the affirmative.

Finally, the court turned to the question of whether the 1831 and 1854 treaties survived the Shawnee's 1869 merger with the Cherokee Nation. The court noted that *The Kansas Indians* said only that a "voluntary abandonment" of tribal organization *"can"* change the effect of those treaties, not that it would necessarily do so. The court pointed out that Felix S. Cohen's oft-cited treatise, which criticized this language, counseled that "abandonment of tribal existence" was a nebulous concept, easily disproven. Cohen's Handbook of Federal Indian Law, pp. 17-18 (1982). The court concluded that BOTA's reliance on *The Kansas Indians* was "misplaced" in light of more recent Supreme Court rulings and that since "[n]either BOTA nor Johnson County have pointed to any Congressional intent to nullify treaty rights established in the 1831 and 1854 treaties . . . the vested rights of the 1831 and 1854 treaties should stand." The district court reversed BOTA and granted Oyler the tax exemption on the grounds that, in light of more recent case law, BOTA "erroneously interpreted or applied the law." K.S.A. 77-621(c)(4).

## Discussion

The County's argument is concisely stated in its brief:

"The District Court's reversal is incorrect because it is based upon the flawed premise that the existence of the restricted allotment necessarily means that some Indian, in this case Mr. Oyler, must be able to benefit from the land's restricted status. *Under U.S. Supreme Court Indian law cases*, . . . even if Mr. Oyler is an 'Indian' as defined by federal law, and even if he lives on 'Indian Country,' *there till must be a viable tribal government which exercises governmental control over the land and the tribal members*. . . . It is not the land's status as 'Indian Country' that alone confers tax exempt status even upon tribal Indians, it is the *tribal sovereignty exercised over that land* and the *individual's submission to tribal jurisdiction* and authority. Those necessary elements are absent in this case." (Emphasis added.)

The County requests that the case be remanded to BOTA for a factual inquiry and determination as to: (1) whether, and if so, to what extent, a tribal government exercises sovereignty over Shawnee Reserve 206, (2) whether Oyler is a member of that tribe or subject to its control, and (3) to what extent state taxation of Oyler's personal property will affect that tribe's sovereignty.

Any analysis of a state's power to impose personal property taxes upon Native Americans claiming immunity from such tax must begin with the United States Supreme Court's recent decision in *Oklahoma Tax Com. v. Sac & Fox Nation*, 508 U.S. ___, 124 L. Ed. 2d 30, 113 S. Ct. 1985 (1993). BOTA did not have the benefit of the *Sac & Fox* opinion at the time it denied Oyler's exemption and protest claims. *Sac & Fox* considered whether Oklahoma could impose state income tax, and of even greater interest in the case at bar, state motor vehicle taxes against members of the Sac and Fox Indians. The taxation issue focused on those Indians who lived not on a formal reservation, but in scattered allotments created by an 1891 treaty between the tribe and the United States. 508 U.S. at ___, 124 L. Ed. 2d at 36.

*Sac & Fox* first addressed whether the general presumption against state tax jurisdiction over Indians, *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973), was affected by whether the Indian lived on an isolated allotment instead of a reservation. The Court held that the reservation versus allotment distinction was not controlling, explaining:

"The residence of a tribal member *is* a significant component of the McClanahan presumption against state tax jurisdiction. But our cases make clear that a tribal

member need *not* live on a formal reservation to be outside the State's taxing jurisdiction; *it is enough that the member live in 'Indian country.'* Congress has defined Indian country broadly to include formal and informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States. See 18 USC § 1151." 508 U.S. at ____, 124 L. Ed. 2d at 39. (Emphasis added.)

Having answered the residence question, *Sac & Fox* then enunciated the framework for analyzing claims of immunity from state taxation, whether the tax is imposed on income or property:

"[I]t must be determined whether the relevant tribal members live in Indian country—whether the land is within reservation boundaries, on allotted lands, or in dependent communities. If the tribal members do live in Indian country, our cases require the court to *analyze the relevant treaties and federal statutes against the backdrop of Indian sovereignty.* Unless Congress *expressly authorized* tax jurisdiction in Indian country, the McClanahan presumption counsels against finding such jurisdiction." 508 U.S. at ____, 124 L. Ed. 2d at 41 (Emphasis added.)

The *McClanahan* presumption, which arises "when a State attempts to assert tax jurisdiction over an Indian tribe or tribal members living and working on land set aside for those members," effectively reverses the general rule that "exemptions from tax laws should . . . be clearly expressed." *Sac & Fox*, 508 U.S. at ____, 124 L. Ed. 2d at 40. "Congressional intent to abrogate treaty rights will not be lightly inferred; such purpose must be 'clear and plain.'" *Oyler v. Allenbrand*, 23 F.3d at 296 (quoting *United States v. Dion*, 476 U.S. 734, 738, 90 L. Ed. 2d 767, 106 S. Ct. 2216 [1986]).

A mechanical application of the *Sac & Fox* test to the case at bar may appear, initially, to favor Oyler. Indeed, he argues, as he did to the district court, that *Sac & Fox* is "dispositive." Oyler contends that because he is an Indian who lives on Indian country, based on the undisputed facts, he is entitled to the *McClanahan* presumption against state taxation. Thus, under the relevant treaties and statutes, unless Congress "expressly authorized" tax jurisdiction over a person of Oyler's ancestry living where he lives, we must find the State has no jurisdiction to tax his vehicles.

In 1831, the Shawnee in Ohio, like their brethren in Missouri, agreed to relocate to Kansas pursuant to a treaty. Article X of

this treaty provided in part: "And the United States guarantee that said lands shall never be within the bounds of any State or territory, nor subject to the laws thereof." Treaty with the Shawnee, August 8, 1831, 7 Stat. 355. Oyler relies on the 1831 treaty in claiming immunity.

Oyler contends, as the district court found, that the 1831 treaty has never been formally abrogated by Congress and was not terminated upon the Shawnee's merger with the Cherokee Nation in 1869.

In *Oyler v. Allenbrand*, 23 F.3d 292, 295 (10th Cir. 1994), the Tenth Circuit recently observed: "We have found no evidence that this [1831] treaty has ever been formally abrogated." With respect to the 1869 merger, the Court of Appeals stated:

"In 1869, the Loyal Band of Shawnee joined with the Cherokee and assumed all rights of the Cherokee Nation, including, presumably, the benefits of the Cherokee Treaty of 1835 [guaranteeing the Cherokee, and persons connected with them, freedom from state jurisdiction]. *There is no evidence, however, that the 1869 merger of the Shawnee and the Cherokee altered any rights vested under previous Shawnee treaties.*" 23 F.3d at 294 n.3. (Emphasis added.)

The issue before the Tenth Circuit in *Allenbrand* was whether Kansas had criminal jurisdiction over Oyler. Because it determined that the 1831 treaty appeared to remain viable and applicable to Shawnee Reserve 206, the court had to determine whether Congress *intended* to partially abrogate the 1831 treaty in passing the Kansas Act, 18 U.S.C. § 3243 (1988), giving Kansas criminal jurisdiction over Indian lands within the state. *Allenbrand* concluded that Congress had such intent but stated its holding narrowly, implying that the 1831 treaty remains viable in other respects:

"Congress, in enacting the Kansas Act, intended to abrogate *certain rights* arising from the Shawnee Treaty.' . . .

. . . .
. . . While we do not find treaty abrogation lightly, we nonetheless read the Kansas Act as having abrogated *the portions of the Shawnee Treaty providing the right to be free from state criminal law.*" 23 F.3d at 298-99.

Given the "federal" nature of a question concerning the continued existence of treaty rights under a treaty between an Indian tribe

and the United States, *Allenbrand*'s discussion of the 1831, 1854, and 1869 treaties is entitled to our respect.

On the other hand, *Allenbrand* focused on whether Kansas had *criminal* jurisdiction over Oyler, not tax jurisdiction, in evaluating Congressional intent with respect to the 1831 treaty. Thus, *Allenbrand* did not engage in the *Sac & Fox* analysis; in fact, it cited neither *Sac & Fox* nor *McClanahan*. *Allenbrand* did not consider the uniqueness or peculiarity of Shawnee Reserve 206, except to say that the Reserve came within the broad umbrella of "Indian land" over which Congress intended to allow state criminal jurisdiction in Kansas. 23 F.3d at 295-97. Thus, even if we read *Allenbrand* to say that the 1831 treaty remains valid except as to criminal jurisdiction, that does not compel the conclusion that under the *Sac & Fox* analysis Oyler is entitled to a tax exemption on the basis of this treaty.

*Sac & Fox* instructs that the *McClanahan* presumption applies to "tribal members" living in Indian country, as opposed to any "Indian." 508 U.S. at ___, 124 L. Ed. 2d at 41. The County's argument is that there is no *tribe* exercising control over Oyler or Shawnee Reserve 206. Oyler is not a "tribal member" as contemplated in *Sac & Fox*, and the presumption does not arise.

The County's argument is appealing for several reasons. First, the "backdrop of Indian sovereignty" element of the *Sac & Fox* analysis expressly refers to "tribal sovereignty." 508 U.S. at ___, 124 L. Ed. 2d at 39. Second, a close look at the Supreme Court opinions concerning property tax jurisdiction over Indians, *e.g.,* *Sac & Fox; Washington v. Confederated Tribes,* 447 U.S. 134, 65 L. Ed. 2d 10, 100 S. Ct. 2069 (1980); *Bryan v. Itasca County,* 426 U.S. 373; and *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463 reveals that each case involved Indians who were expressly (or implicitly, by their residence on a formal reservation) *subject to a tribal government*. In *Sac & Fox*, for example, the Supreme Court discussed in detail the structure of the Sac & Fox tribal government and its efforts to regulate its members living in scattered allotments by imposing its own tribal earnings tax and motor vehicle registration fees. Thus, the County essentially contends that implicit in the *Sac & Fox* holding is the concept that a tribal

government, and therefore concerns of tribal sovereignty, must be present for the *McClanahan* presumption to arise.

The idea that tribal interests, not just individual interests, must be implicated in order for state tax immunity to arise finds ample support in case law and elsewhere. For example, in *Bryan v. Itasca County*, 426 U.S. at 376 n.2, the Supreme Court stated in elaborating on the *McClanahan* framework: "Of course, this pre-emption model usually yields different conclusions as to the application of state laws to tribal Indians who have left or never inhabited federally established reservations, or *Indians 'who do not possess the usual accoutrements of tribal self-government,'* [citations omitted]." (Emphasis added.) Cohen expresses a similar idea in his Handbook of Federal Indian Law, p. 350: "Another circumstance where state courts have limited jurisdiction over Indians is in those areas of Indian country lacking any form of tribal self-government or 'tribal relations.' "

"The majority of off-reservation allotments are governed by functioning tribal governments, but a substantial minority are not. The latter are statutory Indian country and are subject to applicable federal statutes which preempt state laws. It seems improbable, however, that the federal purposes in making these lands Indian country preempt other matters within the scope of tribal self-government; therefore, *until action is taken to place the lands under tribal jurisdiction, state laws should apply.*" Cohen's Handbook of Federal Indian Law, p. 278. (Emphasis added.)

Further, in *Washington v. Confederated Tribes*, 447 U.S. 134, the Supreme Court held that even Indians residing on Indian country were not exempt from state taxes unless they were members of the "governing Tribe." The Court explained:

"The State asserts the power to apply its sales and cigarette taxes to Indians resident on the reservation but not enrolled in the governing Tribe. . . .

"Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe. . . . *Similarly, the mere fact that nonmembers resident on the reservation come within the definition of 'Indian' [under federal law] does not demonstrate a congressional intent to exempt such Indians from state taxation.*

"*Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those*

*Indians stand on the same footing as non-Indians resident on the reservation.* There is no evidence that nonmembers have a say in tribal affairs or significantly share in tribal disbursements. We find, therefore, that the State's interest in taxing these purchasers outweighs any tribal interest that may exist in preventing the State from imposing its taxes." 447 U.S. at 160-61. (Emphasis added.)

In *Sac & Fox*, the Supreme Court addressed state motor vehicle taxes with respect to tribal Indians living on scattered allotments. Since there had been no finding by the Court of Appeals as to whether the Sac and Fox allotments actually qualified as Indian country under federal law, the Supreme Court remanded for a determination on that question. 508 U.S. ___, 124 L. Ed. 2d at 43.

We reverse the district court in the case at bar and remand to BOTA for additional factual findings in conformity with our opinion. Oyler may not be similarly situated to those Indians who have been granted immunity from state taxes under prior United States Supreme Court rulings. We think a mechanical application of *Sac & Fox* (*i.e.*, Oyler is an Indian who lives on Indian country and therefore is entitled to the exemption) is not what the Supreme Court had in mind.

BOTA decided Oyler's exemption claim before the decision in *Sac & Fox*. BOTA made no findings concerning tribal existence, ownership, and control with respect to Shawnee Reserve 206. We remand the case to BOTA with instructions to conduct a factual inquiry as to whether Oyler is, by virtue of his residence on Shawnee Reserve 206, subject to tribal government control and whether such tribal organization exercises any real claim or oversight (sovereignty) over Shawnee Reserve 206. If Oyler and the Indian country on which he resides "do not possess the usual accoutrements of tribal self-government," *McClanahan*, 411 U.S. at 167-68, it is our opinion that he is not immune from state motor vehicle taxes. On remand, the factual inquiry should not extend into Oyler's status as an Indian, his Shawnee ancestry, or his membership in the Cherokee Nation, which have been admitted by the County for this case.

Reversed and remanded to BOTA for additional findings in conformity with the opinion.