<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SHAWNEE TRIBE, a federally
recognized Indian Tribe, and Shawnee
Tribe, ex rel.,

      Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA, et
al.,

      Defendants-Appellees.

No. 04-3256

---

**ORDER**
**Filed September 15, 2005**

---

Before **EBEL**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

Appellants' petition for rehearing is granted in part. A revised opinion is
filed with this order. No judge having called for a poll, rehearing en banc is
denied.

                          Entered for the Court
                          Patrick Fisher, Clerk

                          By:
                              Deputy Clerk

**PUBLISH**

# UNITED STATES COURT OF APPEALS

## TENEMTH CIRCUIT

SHAWNEE TRIBE, a federally
recognized Indian Tribe, and Shawnee
Tribe, ex rel.,

     Plaintiffs-Appellants,

v.

UNITED STATES OF AMERICA; W.
LEIGHTON WATERS, Acting
Regional Administrator, United States
General Services Administration;
STEPHEN A. PERRY, Administrator,
United States General Services
Administration; DONALD
RUMSFELD, Secretary, Department
of Defense; I. BLAINE HASTINGS,
United States General Services
Administration; GAIL A. NORTON,
Secretary, United States Department of
the Interior; NEAL A. McCALEB,
Assistant Secretary of Interior for
Indian Affairs; and THE BUREAU OF
INDIAN AFFAIRS,

     Defendants-Appellees.

No. 04-3256

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 03-CV-2042-GTV)**

R. Scott Beeler (Alok Ahuja and Jennifer M. Hannah with him on the brief), Lathrop & Gage, L.C., Overland Park, KS, for Plaintiffs-Appellants.

David D. Zimmerman, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with him on the brief), Kansas City, KS, for Defendants-Appellees.

---

Before **EBEL**, **HOLLOWAY**, and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

The Sunflower Army Ammunition Plant ("Sunflower Property" or "Plant") is a 9,065-acre military installation located in rural Kansas between Lawrence and Kansas City. In the 1990s, the Army determined it no longer needed the Sunflower Property and requested that the General Services Administration ("GSA") dispose of it as "excess property." Federal law requires the GSA to transfer, without consideration, excess real property located within the reservation of any federally recognized Indian tribe to the Secretary of Interior, to be held in trust for the benefit and use of the tribe. 40 U.S.C. § 523.

The Sunflower Property is located within the historic reservation boundaries of the Shawnee Tribe. However, the GSA determined that this area no longer lies within present-day boundaries of the Shawnee's reservation and, therefore, that the Shawnee were not entitled to a transfer of the Sunflower Property under § 523. The Shawnee Tribe sought judicial review of this

administrative decision, but the district court agreed with the GSA, concluding that the Shawnee Reservation was terminated in an 1854 Treaty between the Shawnee and the United States. This appeal followed.

While this appeal was pending, Congress passed legislation giving the Secretary of the Army specific discretion to convey the Sunflower Property to any entity selected by the Board of Commissioners of Johnson County, Kansas. We have been advised by both sides that the Secretary of the Army has exercised this discretion, and a sale of the Sunflower Property is now in the process of being consummated. Because the Secretary of the Army has this authority and is exercising it, we are unable to give the Shawnee Tribe the consideration-free § 523 transfer they seek. Therefore, all of the Tribe's claims dependent on the availability of this relief are moot.

However, the Shawnee have preserved at least one claim that seeks retrospective relief, and that claim is unaffected by our inability to grant a § 523 transfer in the future. The district court never reached the merits of this claim, concluding instead that it was moot where the Shawnee's reservation had been terminated in 1854. Because we conclude the district court was correct that the 1854 Treaty terminated the Shawnee's reservation, we affirm.

## BACKGROUND

I.    **Shawnee History and Treaties**

In the mid-Nineteenth Century, the Shawnee Tribe held 1.6 million acres of land in Kansas pursuant to 1825 and 1831 treaties with the United States. The Kansas Indians, 72 U.S. (5 Wall.) 737, 738-39 (1866). It is undisputed that the entire Sunflower Army Ammunition Plant lies within this original Shawnee reservation.

However, the Shawnee's Kansas reservation was affected by the encroachment of this country's western expansion and a rapidly increasing non-Indian population in the area. Thus, Congress decided in 1853 it was "advisable to lessen [the Shawnee's] territorial limits," and the President ordered negotiations with the Shawnee. Id. at 753; see also Absentee Shawnee Tribe of Oklahoma v. United States, No. 344, 6 Ind.Cl.Comm'n Dec. 377, 379 (June 19, 1958). Although initial efforts to get the Shawnee to relinquish their lands were unsuccessful, the Shawnee did sign a pivotal treaty with the United States on May 10, 1854. The Kansas Indians, 72 U.S. at 753; Absentee Shawnee Tribe v. Kansas, 862 F.2d 1415, 1417 n.2 (10th Cir. 1988). This 1854 Treaty provides, in pertinent part:

> Article 1. The Shawnee tribe of Indians hereby cede and convey to the United States, all the tract of country [the entire 1.6 million acre reservation] lying west of the State of Missouri, which was designated and set apart for the Shawnees. . . .
>
> Article 2. The United States hereby cede to the Shawnee Indians two hundred thousand acres of land, to be selected between the Missouri State line, and a line parallel thereto, and west of the same, thirty miles distant:

- 4 -

which parallel line shall be drawn from the Kansas River, to the southern boundary-line of the country herein ceded. . . .

Article 3.  In consideration of the cession and sale herein made, the United States agree to pay to the Shawnee people the sum of eight hundred and twenty-nine thousand dollars[1]. . . .

Treaty with the Shawnees, May 10, 1854, U.S.-Shawnee, 10 Stat. 1053.

The Sunflower Property is within the area, described in Article II of this Treaty, that was left open for re-cession to the Shawnees.  However, the Shawnee did not take this entire area collectively.  Instead, pursuant to the treaty, individual Shawnee tribal members were entitled to select 200-acre tracts, primarily for individual ownership, from within this entire area as described by Article II.  The Kansas Indians, 72 U.S. at 753.  As the Supreme Court explained in 1866:

> [The 1854 Treaty] did not contemplate that the Indians should enjoy the whole tract, as the quantity for each individual was limited to two hundred acres.  The unselected lands were to be sold by the government, and the proceeds appropriated to the uses of the Indians.  It also recognized that part of the lands selected by the Indians could be held in common, and part in severalty.  If held in common, they were to be assigned in a compact body; if in severalty, the privilege was conceded of selecting anywhere in the tract outside of the common lands.
>
> The Indians who held separate estates were to have patents issued to them, with such guards and restrictions as Congress should deem advisable for

---

[1]The Indian Claims Commission later awarded the Shawnee over $1.2 million to remedy this "unconscionable" price the United States paid under the 1854 Treaty.  See United States v. Absentee Shawnee, No. 5-72, 1972 WL 20807 (200 Ct. Cl. 194) at *1 (Dec. 12, 1972).

their protection. Congress afterwards directed the lands to be patented, subject to such restrictions as the Secretary of Interior might impose; and these lands are now held by these Indians, under patents, without power of alienation, except by consent of the Secretary of Interior. This treaty was silent about the guarantees of the treaty of 1831 [as to perpetual protection by the United States for the Indians]; but the Shawnees expressly acknowledged their dependence on the government of the United States, as formerly they had done, and invoked its protection and care.[2]

Id. at 753; see also Absentee Shawnee, 862 F.2d at 1422 (describing process by which, after five years, the United States agreed to sell the unallotted parcels and hold the proceeds for an additional five years before distributing them for the benefit of the Shawnees so that if any absentee Shawnee members appeared within the ten-year period they were entitled to the value of their promised allotment).[3]

---

[2]What the Supreme Court is explaining here, and what the 1854 Treaty provides for, is an early experiment with what became the infamous and widespread allotment policy. See generally Jessica A. Shoemaker, Comment, Like Snow in the Spring Time: Allotment, Fractionation, and the Indian Land Tenure Problem, 2003 Wis. L. Rev. 729 (2003); Kenneth H. Bobroff, Retelling Allotment: Indian Property Rights and the Myth of Common Ownership, 54 Vand. L. Rev. 1559 (2001); Judith V. Royster, The Legacy of Allotment, 27 Ariz. St. L.J. 1 (1995).

[3]The district court concluded, "A number of allotments made pursuant to the 1854 Treaty were made to Tribe members either entirely or partially within what is now the [Sunflower Property]. But approximately half of the [Sunflower Property] was not allotted to Tribe members." Shawnee Tribe v. United States, 311 F.Supp.2d 1181, 1186 (D.Kan. 2004). At oral argument, the parties disputed whether half or closer to two-thirds of the Sunflower Property was allotted to Shawnee members. However, the record itself is very unclear on this point. There is also no indication of how or when the United States came into ownership of the Sunflower Property; however, the individual allotments could have been

(continued...)

- 6 -

The record is unclear as to what exactly happened immediately after the 1854 Treaty. However, in 1869, the Shawnee negotiated an agreement with the Cherokee Nation in Oklahoma. Agreement Between Shawnees and Cherokees, June 7, 1869, Approved by the President June 9, 1869. Pursuant to this formal agreement, the Shawnees committed to be "incorporated into and ever remain a part of the Cherokee Nation," and further agreed "that the said Shawnees shall abandon their tribal organization" and turn over to the Cherokee at least some portion of the annuities (including from the 1854 Treaty) owed the Shawnee by the United States. Id.

## II. Sunflower Property Dispute

The United States Army has owned and operated the Sunflower Army Ammunition Plant since 1941. In the 1990s, the Army determined that it no longer needed the property, and requested that the General Services Administration ("GSA") dispose of it as "excess" property.[4] See generally 40

_____

[3](...continued)
sold with the Secretary of Interior's express approval. See The Kansas Indians, 72 U.S. at 753.

[4]"Excess property" is defined as "property under the control of a federal agency that the head of the agency determines is not required to meet the agency's needs or responsibilities." 40 U.S.C. § 102(3) (2002). By contrast, the "term 'surplus property' means excess property that the [General Services] Administrator determines is not required to meet the needs or responsibilities of all federal agencies." Id. § 102(10).

U.S.C. §§ 101-611 (providing for property management, including disposal, role of GSA).

The GSA is required to transfer, without consideration, excess real property to the Department of Interior, in trust for an Indian tribe, whenever three requirements are met: (1) the property is within an Indian reservation, (2) the property is excess, and (3) the reservation belongs to a federally recognized Indian tribe. 40 U.S.C. § 523. On January 7, 1998, the GSA prepared a Notice of Availability for Excess Real Property. On February 10, 1998, the GSA submitted a Federal Screening Notice to the Bureau of Indian Affairs ("BIA"). The GSA asked the BIA to respond by March 13, 1998, if the Sunflower Property was eligible under § 523 to be transferred to the Department of Interior in trust for an Indian tribe. After the BIA failed to request a transfer of the Sunflower site, the GSA began its usual property disposal process.

While the Sunflower Property disposal was still pending, on December 27, 2000, Congress officially identified the Shawnee Tribe as a federally recognized Indian Tribe. 25 U.S.C. § 1041. In accordance with an agreement between the Cherokee and the Shawnee tribes, Congress restored the Shawnee Tribe's "current and historical responsibilities, jurisdiction, and sovereignty as it relates to the Shawnee Tribe, the Cherokee-Shawnee people, and their properties everywhere." Id. All Shawnee land within Oklahoma remained with the Cherokee Nation;

- 8 -

however, Congress and the President recognized that the Shawnee Tribe "from and after its incorporation and its merger with the Cherokee Nation has continued to maintain the Shawnee Tribe's separate culture, language, religion, and organization, and a separate membership roll." Id.

After being federally recognized, the Shawnee submitted a request to the Secretary of Interior, asking that the entire Sunflower Property be transferred to the Department of the Interior ("DOI") in trust for the Tribe's benefit pursuant to the GSA's mandatory transfer obligations under § 523. The Tribe claims that the entire Sunflower Property is within the boundaries of the remaining Shawnee reservation in Kansas and that the Shawnee are therefore entitled to a § 523 transfer. The initial request was made on July 3, 2001. On October 30, 2001; January 18, 2002; and April 16, 2002, the Tribe submitted additional requests.

On September 6, 2002, the GSA wrote to the BIA, requesting a "post haste" determination on the Shawnee reservation issue. On September 19, 2002, Kansas Governor Bill Graves wrote to Gail Norton, Secretary of Interior, opposing the Shawnee's claim to the Sunflower Property and asking for a quick decision from the BIA that the Shawnee Tribe had no interest in the land. On December 6, 2002, the Department of Interior's Assistant Secretary for Indian Affairs provided an opinion letter to the GSA stating:

> Upon receipt of your inquiry, departmental staff engaged upon a thorough review of documents and materials relevant to this issue, including, but not

limited to, property records maintained by the Shawnee Tribe in support of their claim that the Sunflower site lies within the exterior boundaries of their reservation, and certain treaties and statutes pertaining to the Shawnee Tribe and/or their lands. Based on this review it is our opinion that the Sunflower Army Ammunition Depot does not lie within the present day exterior boundaries of the Shawnee Tribe's reservation.

After receiving this determination, the GSA issued its final decision concerning a possible § 523 transfer in February 2003 stating:

Concerning the § 523 transfer request, the GSA has carefully reviewed the December 6, 2002 letter from Mr. Neal McCaleb, Assistant Secretary for Indian Affairs, U.S. Department of the Interior ("DOI"). In reliance upon the DOI determination that Sunflower does not lie within the present day exterior boundaries of the Shawnee Tribe "Indian Reservation," you are advised that the Shawnee Tribe is not eligible for transfer consideration of any of the Sunflower Army Ammunition Plant . . . pursuant to 40 U.S.C. § 523.

The Shawnee Tribe sought judicial review of this administrative decision in federal district court. The Tribe claimed the GSA had failed to comply with its mandatory transfer responsibility under § 523. The Shawnee further argued that the United States had breached its fiduciary duty owed to the Shawnee in various aspects of its handling of the Sunflower Property. In addition, they claimed the GSA's arbitrary and capricious acts deprived them of due process. The court upheld the GSA's decision, determining as a threshold matter that the Shawnee's reservation had been terminated by the 1854 Treaty. Shawnee Tribe, 311 F.Supp.2d at 1197. Then, based on this determination, the district court

concluded that all of the Tribe's other claims were moot. Id. 1196-97. The Shawnee Tribe appealed.

On February 7, 2005, the United States notified us of a change in the law governing the Sunflower Property's disposal that it argues moots some or all of this appeal. Appellants then moved for expedited review, citing recent published news accounts of an anticipated transfer of the Sunflower Property to a developer on or before May 31, 2005. We granted that motion and heard oral argument in March of 2005.

## JUSTICIABILITY

The United States raised the mootness issue in this case by submitting a Rule 28(j) letter notifying us of recent legislative developments. See Fed. R.App. P. 28(j). Specifically, the Government cites Congress's enactment of § 2841 of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005, an authorization entitled "Land Conveyance, Sunflower Army Ammunition Plant, Kansas." Pub. L. No. 108-375, § 2841, 118 Stat. 1811, 2135 (2004). This section provides that the "Secretary of the Army, in consultation with the Administrator of General Services, may convey to an entity selected by the Board of Commissioners of Johnson County, Kansas . . . the Sunflower Army Ammunition Plant . . . for economic development and revitalization." Id.

Whereas 40 U.S.C. § 523, on which the Shawnee base their claim to the Sunflower Property, governs general transfers of excess real property by the GSA to the Department of Interior for the use and benefit of Indian tribes,[5] the Government emphasizes that § 2841 of the military authorization bill provides different standards dictating when and how a transfer of the Sunflower Property can be made, and identifies a new official to make the final transfer decision. Based upon representations that the Secretary of the Army has chosen to exercise this authority under § 2841 to convey this property, the Government argues that § 2841 moots the Shawnee's claim to a transfer under § 523 in the Property Act. The Shawnee Tribe disagrees, reading § 523 as controlling this case despite the enactment of § 2841.[6]

Because questions of mootness go to our jurisdiction, we address this issue at the outset. Seneca-Cayuga Tribe v. Nat'l Indian Gaming Comm., 327 F.3d

---

[5]Section 523, as it is codified, is part of the larger Property Act, which is intended broadly to "provide the Federal Government with an economical and efficient system" for procuring, using, disposing, and keeping track of federal property. 40 U.S.C. § 101.

[6]Procedurally, the Shawnee Tribe purported to file their response to this mootness argument in what appears to be another Rule 28(j) letter; however, a Rule 28(j) letter is not the proper mechanism to address a new argument. See United States v. Lindsey, 389 F.3d 1334, 1335-36 n.1 (10th Cir. 2004). Nonetheless, the Government did not object to this filing, and because mootness is jurisdictional, we are compelled to consider these issues fully regardless of this procedural nuance. See McClendon v. City of Albuquerque, 100 F.3d 863, 867 (10th Cir. 1996). The parties also made their positions on mootness clear at oral argument.

1019, 1028 (10th Cir. 2003).  Ultimately, we agree with the Government and conclude that § 2841 moots all of the Shawnee's claims that are tied to their quest for a § 523 transfer of the Sunflower Property.

### A.   Mootness overview

We review mootness questions de novo.  Id.  We also review questions of statutory interpretation de novo.  Hill v. SmithKline Beecham Corp., 393 F.3d 1111, 1117 (10th Cir. 2004).

Article III of the Constitution allows federal courts to adjudicate only "actual, ongoing controversies."  Honig v. Doe, 484 U.S. 305, 317 (1988).  As an appellate court, we cannot rule on a case which, although live when brought in the district court, has been rendered moot by later events.  See id.  An appeal is moot when we are unable to redress a plaintiff's injury by a favorable judicial decision, even if redressability was possible when the suit was initiated.  Park County Resource Council v. USDA, 817 F.2d 609, 614-15 (10th Cir. 1987), overruled on other grounds by Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 973 (10th Cir.1992); see also Airport Neighbors Alliance v. United States, 90 F.3d 426, 428-29 (10th Cir. 1996).

The appeal in this case arose after the Shawnee Tribe claimed entitlement to a mandatory transfer of the Sunflower Property pursuant to § 523, which provides:

The Administrator of General Services shall prescribe procedures necessary to transfer to the Secretary of the Interior, without compensation, excess real property located within the reservation of any group, band, or tribe of Indians that is recognized as eligible for services by the Bureau of Indian Affairs. . . . [T]he Secretary shall hold excess real property transferred under this section in trust for the benefit and use of the group, band, or tribe of Indians, within whose reservation the excess real property is located.

40 U.S.C. §§ 523(a), (b)(1).

In contrast, the new § 2841 authority on which the Government makes its mootness argument provides:

(a) The Secretary of the Army, in consultation with the Administrator of General Services, may convey to an entity selected by the Board of Commissioners of Johnson County, Kansas (in this section referred to as the "entity" and the "Board," respectively), all right, title, and interest of the United States in and to a parcel of real property, including any improvements thereon, consisting of approximately 9,065 acres and containing the Sunflower Army Ammunition Plant. The purpose of the conveyance is to facilitate the re-use of the property for economic development and revitalization. . . .

(c) The conveyance authority provided by subsection (a) is in addition to the conveyance authority provided by section 2823 of the Military Construction Authorization Act for Fiscal Year 2003 (division B of Public Law 107-314, 116 Stat. 2712) to convey a portion of the Sunflower Army Ammunition Plant to the Johnson County Park and Recreation District.[7]

_____

[7]The parties have not discussed § 2823 of this 2003 Act in filings to this court. However, § 2823 of the 2003 National Defense Authorization Act provides that the GSA "may convey" approximately 2,000 acres of the Sunflower Property to the Johnson County Park and Recreation District in a manner consistent with 40 U.S.C. § 550(e), which governs the disposal of real property for use as a public park or recreation area. Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, § 2823, 116 Stat. 2458, 2712 (2002).

(continued...)

§ 2841, 118 Stat. at 2135.

Faced with whether the new § 2841 moots the Shawnee's claim to a transfer under § 523, we must first decide whether § 2841's grant of discretion to the Secretary of the Army, combined with the Secretary's election to exercise that discretion, in fact operates to relieve the GSA of its mandatory transfer duties under § 523. After concluding that it does, we must determine whether Congress has constitutionally exercised its authority in enacting § 2841, which has the effect of mooting a specific pending lawsuit. We conclude that § 2841 is a permissible exercise of legislative authority. Therefore, § 2841 moots the Shawnee's claims they are entitled to a § 523 transfer.

**B. Effect of the Secretary of the Army's existing discretion under § 2841 on GSA's authority under § 523**

It is a "fundamental canon of statutory construction that, when there is an apparent conflict between a specific provision and a more general one, the more specific one governs." United States v. Groves, 369 F.3d 1178, 1188 n.5 (10th Cir. 2004) (quotation omitted). By enacting § 2841, Congress granted specific discretion to the Secretary of the Army to dispose of the Sunflower Property in particular. Therefore, the most logical reading of this scheme is that Congress

---

[7](...continued)
Because no one asserts the relevance of § 2823, we do not consider it.

intended the specificity of § 2841 to control over the general obligations of § 523 and the Property Act.[8]

The Shawnee Tribe raises two arguments against the applicability of § 2841 to this case.

### 1. "Limitations" provision

First, the Shawnee rely on a provision of the Property Act that they say makes § 523 controlling regardless of the subsequent passage of § 2841.

---

[8]However, the point that § 2841 vested <u>discretion</u> in the Secretary of the Army to decide whether to effectuate a transfer of the Sunflower Property is an important one. Presumably, the Secretary could have elected not to transfer the Sunflower Property pursuant to this authority, and then the general Property Act provisions would have again applied. However, this is not our case. Here, the Secretary of the Army has already chosen to exercise this § 2841 authority, and every indication is that a conveyance of the Sunflower Property is imminent. Unless or until the Secretary chose to forego this authority—effectively exercising discretion to relinquish this authority altogether—the continued viability of the more specific § 2841 suspends application of § 523 with respect to the Sunflower Property.

In the very unlikely event that the Secretary reversed course and surrendered the Sunflower Property back to the GSA for disposal, then the Shawnee might renew their § 523 claims. However, mootness exceptions exist only for <u>likely</u> recurrences—such as where a defendant voluntarily ceases the challenged action but is likely to return to earlier practices, or where the very nature of a challenged action makes it "capable of repetition yet evading review." These exceptions do not apply in our case where a return of the Sunflower Property to GSA's management authority is highly <u>unlikely</u>. The United States, as owner of the Sunflower Property, has chosen to dispose of this unique piece of land in a particular way, and the Secretary of the Army is now completing that sale.

Specifically, they rely on § 113 of the Property Act as codified, a section entitled "Limitations," which mandates:

> Except as otherwise provided in this section, the authority conferred by this subtitle [including § 523] is in addition to any other authority conferred by law and is not subject to any inconsistent provision of law.

40 U.S.C. § 113(a). This section then proceeds to enumerate several exceptions to which the Property Act expressly does not apply; however, none of these exceptions apply here. See 40 U.S.C. § 113(b)-(e). Therefore, the Shawnee Tribe reads this language in § 113(a) to mean that the Property Act trumps *any* other inconsistent grant of authority, including § 2841, and therefore that § 523 still governs this case.

However, the language of § 113 does not compel this reading. Instead, the phrase "in addition to any other authority" suggests the opposite—that § 523 does not preempt other laws. Similarly, the fact that § 523 is not itself "subject to any inconsistent provision of law" does not necessarily mean that § 523 controls regardless of the subsequent passage of any other authority. As we conclude later, this language most likely means only that § 523 is not subject to any inconsistent law then in existence, rather than addressing future legislation.

The Government and the Shawnee refer to different sections of the legislative history to support their very different readings of this statute. First, the Shawnee Tribe points to an earlier version of § 113, which provides that the

- 17 -

Property Act "shall be in addition and <u>paramount</u> to any authority conferred by any other law." 40 U.S.C. § 474(c) (2000) (emphasis added). The Shawnee argue we should read the current language of § 113(a) as consistent with this "paramount" meaning. The Shawnee emphasize that "paramount" was removed from § 113 in 2002 as part of a recodification of the Property Act, and that recodification was intended to "make[] no substantive change in existing law and may not be construed as making a substantive change in existing law."[9] Act of August 21, 2002, Pub. L. No. 107-217, § 5(b)(1), 116 Stat. 1062, 1303 (codified as note preceding 40 U.S.C. § 101). Therefore, the Shawnee say we should interpret the current § 113(a) as meaning that the Property Act, and specifically § 523, is "paramount" and therefore that the GSA's mandatory duties under § 523 attach regardless of the subsequent passage of § 2841.[10]

---

[9]In addition, the historical notes to § 113 itself also say that "the word 'paramount' is omitted as included in 'not subject to any inconsistent provision.'" 40 U.S.C. app. § 113.

[10]The Shawnee rely heavily on the decision in <u>San Francisco Drydock, Inc. v. Dalton</u>, 131 F.3d 776 (9th Cir. 1990). There, the Ninth Circuit interpreted the meaning of "paramount" in prior versions of § 113 in the context of a Navy leasing deal. Specifically, <u>San Francisco Drydock</u> addressed a statutory amendment permitting the Department of Defense to lease property at a military installation in the process of being closed or realigned. <u>Id.</u> at 779. The plaintiffs challenged the Navy's leasing of a drydock pursuant to this new authority by procedures that did not satisfy the Property Act's open bidding requirements. <u>Id.</u> The Ninth Circuit interpreted the word "paramount" broadly and emphasized that the purpose of the new leasing authority—which was to "facilitate State or local economic adjustment efforts"—was not inconsistent with the Property Act's

(continued...)

However, the Shawnee's interpretation would have us read § 2841 as being a nullity. They would have the preexistent Property Act give exclusive authority to the GSA to dispose of the Sunflower Property irrespective of the subsequent enactment of § 2841. We have an obligation to construe statutes together so as to prevent such a result. See Bridger Coal Co./Pac. Minerals, Inc. v. Dir., Office of Workers' Compensation Programs, 927 F.2d 1150, 1153 (10th Cir.1991) ("We will not construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous."); accord F.D.I.C. v. Canfield, 967 F.2d 443, 447-48 (10th Cir. 1992). The clear intent of § 2841 is to give the Secretary of the Army

---

[10](...continued)
emphasis on ensuring a fair and open bidding procedure. Id. at 779, 780. Therefore, the court held that the Property Act bid procedures were "paramount" and, because nothing actually exempted the Navy from its provisions, the Navy was required to comply with the Property Act when arranging a lease pursuant to its new authority. Id. at 779-80.

However, we do not necessarily find this case helpful to the Shawnee. The Ninth Circuit merely construed the Navy statute and the Property Act together. The Navy statute was silent as to the procedures regarding how the leases should be executed, and the court held the Property Act's existing procedures should apply. However, the court in San Francisco Drydock did not construe the Property Act to preclude the Navy's authority to lease the property at issue, even though the Property Act standing alone would presumably have vested that authority in the GSA. Id. at 778. These types of procedural issues are not now before us. Moreover, we also construe § 2841 and § 523 together. Section 2841 allows the Secretary of the Army to dispose of the Sunflower Property in one way and, if the plant is disposed of in that manner, there is simply no "excess" property to be disposed of under § 523, thereby mooting any claim that such property should be disposed of pursuant to § 523.

- 19 -

authority to dispose of the Sunflower Property in an alternative manner, and thus to remove this property from the reach of § 523. We must give this intent effect.

Therefore, we think the Government's interpretation is not only correct, but also more sensible. The Government emphasizes § 5(b)(3) of the Legislative Purpose and Construction statement passed as part of the 2002 recodification of the Property Act, which says:

> This Act restates certain laws enacted before April 1, 2002. Any law enacted after March 31, 2002, that is inconsistent with this Act, including any law purporting to amend or repeal a provision that is repealed by this Act, supersedes this Act to the extent of the inconsistency.

§ 5(b)(3), 116 Stat. at 1303 (codified as note preceding 40 U.S.C. § 101). Although the Shawnee try to discount this as just a reviser's note, this statement was legislatively enacted as part of the public law and is a good indication of Congressional intent, even though it is not an operative part of the statute itself.[11] See 1 Sutherland Statutory Construction § 5A:5 (6th ed.); cf. Public Lands Council v. Babbitt, 167 F.3d 1287, 1299 n.5 (10th Cir. 1999) (rehearing).

We find this time restriction very persuasive. Construing § 113 in light of this legislative statement produces the only reading that makes sense—leaving § 113 to stand for the relatively unremarkable proposition that the Property Act

_____

[11]In fact, this § 5(b)(3) is from the same general legislative statement that the Shawnee rely on elsewhere for the fact that the 2002 recodification of the Property Act was intended to be without substantive change.

trumps any pre-existing laws not specifically excluded by § 113 when it was re-enacted in 2002, but that the Congress is, of course, free to change the Property Act's coverage in the future by any act enacted after March 31, 2002. Thus, § 2841 of the 2005 National Defense Authorization Act, which was passed in October of 2004, suspends the Property Act's applicability in this case as it gives discretion to dispose of this particular property to the Secretary of the Army.

### 2. Presumption against implied amendment

This leads to the Shawnee's second argument, which is that implied amendments and implied repeals are disfavored, and therefore we should not read § 2841 as impliedly amending the reach of § 523 with regard to the Sunflower Property. See City of Tulsa v. Midland Valley R. Co., 168 F.2d 252, 254 (10th Cir. 1948) ("Since repeals by implication are not favored in the law, we should not impute to the Legislature an intent to repeal, modify or supersede the former Act unless such intention is manifestly clear from the context of the legislation."). The Shawnee Tribe correctly points out that § 2841's more recent Sunflower-specific grant of discretion to the Secretary of the Army was added to the 2005 military authorization bill without discussion or reference to its impact on either § 523 or the Property Act more generally.

Nonetheless, § 2841 is very specific, applying only to the Sunflower Property. Therefore, it is exceedingly difficult to imagine that Congress did not

intend § 2841 to control over any other statutory property provisions that might otherwise have affected this case. Moreover, § 523 is not repealed or even amended; it simply has no application to the Sunflower Property so long as the property is subject to disposal in this alternative fashion by the Secretary of the Army.

## C.    Congressional authority to moot this lawsuit

Having held that § 2841 controls this case in light of the Secretary of the Army's election to exercise his discretion to dispose of the Sunflower Plant pursuant to § 2841, we must decide whether Congress had the power to moot the Shawnee's pending claim under § 523 by enacting § 2841 after the lower court's decision in this case.[12] "It is well settled that the enactment of legislation can moot an appeal even though there may have been a viable issue in the district court." New Mexico State Highway Dep't v. Goldschmidt, 629 F.2d 665, 667 (10th Cir. 1980); see also 5 Am. Jur. 2d Appellate Review § 657. This includes legislation that specifically eliminates the source of the original dispute or changes the law pertaining to a particular lawsuit. e.g., Khodara Envtl., Inc. v. Beckman, 237 F.3d 186, 193-94 (3rd Cir. 2001); Walker v. United States Dept. of Housing and Urban Dev., 912 F.2d 819, 828-29 (5th Cir. 1990); Stop H-3 Ass'n

---

[12]The parties do not raise this issue specifically; however, it was addressed briefly in colloquy with the court at oral argument. See generally United States v. Sioux Nation of Indians, 448 U.S. 371, 392 (1980).

v. Dole, 870 F.2d 1419, 1432, 1435 n.24 (9th Cir. 1989); Friends of the Earth, Inc. v. Weinberger, 562 F.Supp. 265, 270-71 (D.D.C. 1983).

Congress clearly can make changes in the law and apply those changes to cases still pending on appeal.  Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 233 n.7 (1995).  Thus, when a plaintiff, as here, seeks only prospective relief, appellate courts must consider the law as it exists at the time of the appeal.[13]  Kikumura v. Hurley, 242 F.3d 950, 961 n.5 (10th Cir. 2001); Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1158 (10th Cir. 2000).

However, the principle of separation of powers does place some limits on the ability of Congress to dictate the work of the Article III courts.  See generally Plaut, 514 U.S. at 219-25.  Congress cannot set aside a final judgment of an Article III court by retroactive legislation.  Id. at 240.  Similarly, the separation of powers prevents Congress from vesting in the Executive Branch the authority to review the decisions of Article III courts.  Hayburn's Case, 2 U.S. (2 Dall.) 408, 410 (1792).

Finally, and most importantly for our purposes, Congress cannot dictate findings or command specific results in pending cases.  See United States v.

---

[13]This is especially logical in this case where the United States is acting in its proprietary capacity as a land owner and, until the Sunflower Property is actually disposed of, it is free to do with the property what it wishes and to provide whatever rules of disposal it deems appropriate.

Klein, 80 U.S. (13 Wall.) 128, 146-47 (1871).  In Klein, the Supreme Court

refused to give effect to a statute that was said to "prescribe rules of decision to

the Judicial Department of the government in cases pending before it."  Id. at 146.

In Klein, the Court considered a proviso in an appropriations bill for the Court of

Claims in which Congress attempted to prevent the court from considering

previously granted presidential pardons as the proof of loyalty required to restore

individuals' property rights in the aftermath of the Civil War.  See United States

v. Sioux Nation of Indians, 448 U.S. 371, 402-08 (1980) (setting out facts in

Klein).  The proviso also required the court to dismiss any pending case, and any

future case, where a pardon had been used to establish loyalty or where a claimant

had received a pardon.  Id. at 403.  The Court in Klein found unacceptable this

proviso's "great and controlling purpose . . . to deny to pardons granted by the

President the effect which this court had adjudged them to have" in pending

cases.[14]  Klein, 80 U.S. at 145.

Although Klein might be read broadly, it has been significantly limited by

subsequent Supreme Court decisions.  See, e.g., Plaut, 514 U.S. at 218

---

[14]The Court actually said this proviso was unconstitutional for two reasons.
First, it "prescribed a rule of decision in a case pending before the courts, and did
so in a manner that required the courts to decide a controversy in the
Government's favor."  Sioux Nation, 448 U.S. at 404 (citing Klein, 80 U.S. at
146-47).  Second, it also impaired "the effect of a pardon, and thus infring[ed] the
constitutional power of the Executive."  Id. at 404-05 (quoting Klein, 80 U.S. at
147).

("Whatever the precise scope of <u>Klein</u>, however, later decisions have made clear that its prohibition does not take hold when Congress amends applicable law.") (quotations, alterations omitted). In <u>Robertson v. Seattle Audubon Society</u>, 503 U.S. 429, 441 (1992), for example, the Court upheld a provision in an appropriations bill that Congress passed in direct response to ongoing litigation involving timber sales in the Northwest. The new statute at issue in <u>Robertson</u> mandated new standards for forest management in thirteen national forests that were intended to serve as "adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases" in the litigation in question. <u>Id.</u> at 434-35 (quotation omitted). The Court held that this new authority "compelled changes in law, not findings or results under old law" and therefore was a permissible exercise of legislative power. <u>Id.</u> at 438. In addition, the Court stressed that the new authority did not "purport[] to direct any particular findings of fact or applications of law, old or new, to fact." <u>Id.</u> Instead, because Congress left the courts to adjudicate the impact of the newly articulated standards in the particular cases at bar, the act was lawful. <u>Id.</u>; <u>see also</u> <u>Anixter v. Home-Stake Prod. Co.</u>, 977 F.2d 1533, 1544 (10th Cir. 1992) (recognizing Congress can change existing law or create new law as long as the courts are left to their adjudicative function of interpreting and applying the

meaning and effect of the new governing law); Miller v. French, 530 U.S. 327, 342-44 (2000).

In this case, § 2841 simply provides a supervening way to dispose of the particular Sunflower Property. As long as the Secretary of the Army exercises that authority to dispose of the property, we hold that any claim under § 523 is moot. However, § 2841 itself purports neither to compel a particular decision in the case before us nor to decide how the law applies to our specific facts. That function is left to us as a court. Therefore, we conclude that § 2841 is a constitutional exercise of Congress's power to amend existing law and make it applicable to the property which is the subject of this pending case. See Adarand Constructors, 228 F.3d at 1158. Thus, we conclude that § 2841 constitutionally makes § 523 inapplicable to the Sunflower Property and moots the Shawnee's claim that they are entitled to such a transfer.

**D.    Effect of § 2841 on Shawnee Tribe's other non-APA claims**

Finally, we need to determine what effect § 2841 has on the Shawnee Tribe's remaining non-APA claims, which the Shawnee summarize as "related claims for the government's breaches of fiduciary duties toward the Tribe, for violations of due process, and for equitable relief and damages." To the extent these non-APA claims seek prospective relief tied to the Tribe's quest for a transfer of the Sunflower Property pursuant to § 523, those non-APA claims are

- 26 -

moot for the reasons stated above. See District 22 United Mine Workers of Am. v. Utah, 229 F.3d 982, 987 (10th Cir. 2000) ("[A] case becomes moot when it becomes impossible for the court to grant any effectual relief whatever to a prevailing party.").

However, the Tribe does seek some relief that is not affected by the Army's new discretion under § 2841.[15] Our inability to compel the GSA to transfer the Sunflower Property to the Tribe does not moot these claims.

Although the Government lodged several serious 12(b)(1) and 12(b)(6) challenges to these non-APA claims in a motion to dismiss below, the district court never ruled on these aspects of the Government's motion. Instead, in the context of its APA review, the court determined that the Shawnee's reservation had been terminated by the 1854 Treaty. Shawnee Tribe, 311 F.Supp.2d at 1196.

---

[15]The Shawnee Tribe originally pursued a separate claim for "Equitable Relief," which included a claim for "the fair rental value of the land ceded to the Defendants . . . from the time of transfer through 2002." The Tribe voluntarily dismissed this claim in the district court. Although the addendum clauses of their remaining claims, Counts One through Three, do not list any damage requests, one paragraph within Count II ("Breaches of Trust") does assert:

> The Shawnee Tribe is entitled to damages in an amount in excess of $75,000 for unpaid rents, for wrongful uses of [Sunflower Property], for natural resource damages to the [Sunflower Property] lands, and the remainder of the 1825 Treaty lands from the Shawnee Tribe and its members.

The Tribe contends that at least this retrospective relief claim remains in the case. We agree.

- 27 -

Then, the court concluded that all of the Tribe's non-APA claims were moot because "[a]ll of the Tribe's claims are dependent upon the court finding that the 1854 Treaty did not terminate the Shawnee reservation," and it dismissed them on this jurisdictional ground. Id. at 1197.

The Tribe did not appeal this holding that the termination of their reservation in 1854 moots all of their non-APA claims. [16] That is, the Tribe does not dispute that, if their reservation has been terminated by the 1854 Treaty, their non-APA claims are moot. Therefore, we proceed to address whether these remaining non-APA claims are jurisdictionally barred for the reason stated by the district court. In other words, we decide whether the district court correctly determined that the triggering event for mootness, the termination of the Shawnee's reservation by the 1854 Treaty, had occurred. See Pritchett v. Office Depot, Inc., 404 F.3d 1232, 1234 (10th Cir. 2005) ("[F]ederal courts always have jurisdiction to consider their own jurisdiction.").

---

[16]To the contrary, on appeal the Tribe seems to concede that the justiciability of these non-APA claims hinges on the question of whether a Shawnee reservation in Kansas still exists. The Tribe's opening brief asserts: "The District court likewise dismissed the Tribe's non-APA claims based solely on its conclusion that the Shawnee reservation had been extinguished; if this court rejects that conclusion, the non-APA claims should be remanded for further proceedings." Similarly, in its petition for rehearing, the Tribe argues "[i]f the Shawnee are correct as to the reservation status of the Property . . . their damages claims survive, whether or not a federal court can now order a § 523 transfer."

- 28 -

If the Shawnee reservation in Kansas had not been terminated, and the Tribe's non-APA claims were therefore not moot on that grounds, we would remand for further proceedings on the Government's other jurisdictional objections. However, after reviewing this threshold issue, we agree with the district court that the Shawnee's reservation has been terminated. Accordingly, we affirm the district court's conclusion that all of the Tribe's non-APA claims are moot.

## RESERVATION STATUS

We review whether the 1854 Treaty terminated the Shawnee's reservation de novo. Pittsburg & Midway Coal Min. Co. v. Yazzie, 909 F.2d 1387, 1393 (10th Cir. 1990). In making this determination, we review the entire historical record presented for us on appeal.

Congress can terminate an Indian reservation unilaterally, see Lone Wolf v. Hitchcock, 187 U.S. 553, 566 (1903), or pursuant to a treaty between the United States and the affected tribe. Felix S. Cohen, Handbook of Federal Indian Law 43 (1982). Here, the district court concluded that the Shawnee's 1854 Treaty with the United States terminated the Shawnee reservation in Kansas. In Absentee Shawnee Tribe of Indians of Oklahoma v. Kansas, we reviewed this same 1854 Treaty and determined it was "the product of at least some negotiation." 862 F.2d at 1417 & n.2. Therefore, we explained that the intentions of both the Shawnee

and the United States "must control any attempt to interpret" this Treaty. Id. at 1417 (citing Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 675 (1979) (a treaty is "essentially a contract between two sovereign nations")).

Generally, courts construe Indian treaties sympathetically to Indian interests to compensate for their unequal bargaining positions in the treaty-making process. See Carpenter v. Shaw, 280 U.S. 363, 366-67 (1930). Thus, Indian treaties are interpreted "so far as possible, in the sense in which the Indians understood them, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." Absentee Shawnee, 862 F.2d at 1418 (quotations omitted). However, we "may not . . . ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." Id. (quotation omitted).

Also as a general rule, an intent to terminate or diminish an Indian reservation will not be lightly inferred and demands "substantial and compelling evidence." Solem v. Bartlett, 465 U.S. 463, 472 (1984). "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."[17] Id. at 470.

_____

[17]This distinction between a property's title and a reservation's territory is

(continued...)

- 30 -

Questions of whether a reservation has been diminished or terminated have more typically arisen in the context of interpreting surplus land acts, pursuant to which historic Congresses unilaterally sought to open Indian lands for non-Indian settlement.  See, e.g., Pittsburg, 909 F.2d at 1394.  Although the analytic framework for these cases has been aimed primarily at interpreting Congressional intent, we find the same factors and analysis persuasive in interpreting the intent of both the Shawnee and Congress in this Treaty.  See Absentee Shawnee, 862 F.2d at 1420 n.3.

## A.    Legal framework

Whether a particular treaty or Congressional act was intended to extinguish some or all of an existing reservation requires a case-by-case analysis.[18]  Solem,

---

[17](...continued)
important.  Generally, tribes have jurisdiction within a reservation's boundaries regardless of land ownership patterns within that territory.  See 18 U.S.C. § 1151(a); DeCoteau v. Dist. County Court, 420 U.S. 425, 427 n.2 (1975); Cohen, Handbook of Federal Indian Law at 34-38.  However, where there is no longer a reservation, tribal jurisdiction is generally limited to those portions of the opened lands that have remained Indian allotments, reflecting jurisdiction based on property rather than territory.  See 18 U.S.C. § 1151(c); Solem, 465 U.S. at 467 & n.8; Cohen, Handbook of Federal Indian Law at 39-41.

[18]As we begin this inquiry, we are aware that historically the distinction between "acquiring Indian property and assuming jurisdiction over Indian territory" was not seen as "a critical one, in part because the notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar, and in part because Congress then assumed that the reservation system would fade over time."  South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 343 (1998) (quotation, citation omitted); see also Solem, 465 U.S. at 468.

(continued...)

465 U.S. at 468-69. We look to three factors to determine whether a reservation's boundaries have been altered. See Hagen v. Utah, 510 U.S. 399, 410-11 (1994). First, the "most probative evidence" is the language used to open Indian lands.[19] Solem, 465 U.S. at 470. Second, we consider the historical context surrounding the change. Id. at 471. Finally, "to a lesser extent," we look to the subsequent treatment of the area in question and the pattern of settlement there as clues to the parties' earlier intentions. Id.

Within this framework, the Court has held that "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unalloted opened lands."[20] Id. at 470. In addition, where "language of cession is

_____

[18](...continued)
However, even given this Congressional desire to end the reservation system, we have never extrapolated a wholesale desire to terminate reservations to every effort to open Indian land to non-Indian settlements, and we have required a "case-by-case" analysis. Pittsburg, 909 F.2d at 1395.

[19]In this context, "operative language . . . is more powerful than incidental language embedded in secondary provisions." Pittsburg, 909 F.2d at 1395.

[20]This is in contrast to language that "simply offered non-Indians the opportunity to purchase land within established reservation boundaries." Solem, 465 U.S. at 470. "In both Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 355 . . . (1962), and Mattz v. Arnett, 412 U.S. 481, 501-502 . . . (1973), [the Court] held that Acts declaring surplus land 'subject to settlement, entry, and purchase,' without more, did not evince congressional intent to diminish the reservations." Yankton Sioux, 522 U.S. at 345.
Both Mattz and Seymour also provided only that whatever uncertain future
(continued...)

- 32 -

buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." Id. at 470-71.

Thus, where a tribe agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands within the limits of the reservation . . . after the allotments . . . have been made" in exchange for a "sum certain" of $2.50 per acre of unalloted land, the Court found the entire reservation terminated.[21] DeCoteau, 420 U.S. at 437 n.1, 445. This was especially true where the Act in question essentially ratified "a previously negotiated agreement" with the tribe. Id. at 448; see id. at 445 ("[N]egotiations . . . show plainly that the Indians were willing to convey to the Government, for a sum certain, all of their interest in all of their unallotted lands").

More recently, the Court has also held that language indicating "the restoration of unallotted reservation lands to the public domain evidences a

---

[20](...continued)
proceeds were received for the opened lands would be put in a fund and applied for the tribe's benefit. See DeCoteau, 420 U.S. at 448-49 (summarizing cases).

[21]In DeCoteau, the Court recognized that, "in hindsight, it may be argued that the tribe and the Government would have been better advised to have carved out a diminished reservation." 420 U.S. at 447. Nonetheless, by providing for the "cession of all, rather than simply a major portion of, the affected tribe's unallotted lands," the tribe's remaining jurisdiction was "limited to the retained allotments." Id. at 446.

congressional intent with respect to those lands inconsistent with the continuation of reservation status."[22] Hagen, 510 U.S. at 414. Similarly, in Pittsburg, we said that "[e]specially when a reservation addition is made only for the limited purpose of allotments of some of the land to individual Indians in severalty, the [entire] reservation [addition] is terminated when the lands are allotted and the remainder [of the added lands] restored to the public domain." 909 F.2d at 1420.

Ultimately, no magic words are required as prerequisites for finding reservation boundaries have been altered. See Solem, 465 U.S. at 471. We also look to the act or treaty's historical context. Id. Thus, if

> events surrounding the passage of a surplus land act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative reports presented to Congress—unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged.

Id.; see also Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 588 (1977) (concluding that a Congressional act guaranteeing tribe only the proceeds from sale of opened

---

[22]In Hagen, the operative language of the Act in question provided for allocations of reservation land to individual Indians and that "when the deadline for allotments passed, all the unallotted lands within said reservation shall be restored to the public domain and subject to homesteading at $1.25 per acre" with the proceeds to benefit the Indians. 510 U.S. at 404 (quotation omitted); see also id. at 412.

lands, rather than any unconditional payment, still had effect of altering reservation boundaries based on tenor of prior agreements with tribe).

Finally, while recognizing this is an "unorthodox and potentially unreliable" method of interpretation, the Court has also looked to subsequent events "for the obvious practical advantages" and to decipher parties' earlier intentions. Solem, 465 U.S. at 471-72 & n.13. This includes looking to federal and local authorities' approaches to the lands in question and to the area's subsequent demographic history. Id. at 471-72. "Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that de facto, if not de jure, diminishment may have occurred."[23] Id. at 471. However, these latter factors are

_____

[23]In Yankton Sioux, for example, the Court considered a federal-tribal agreement wherein the tribe agreed to "cede, sell, relinquish, and convey to the United States" all of the unallotted lands for $600,000 but on the condition of an express savings clause that the tribe's earlier treaties, which created the original reservation, should remain in full force and effect. 522 U.S. at 337 n.1. In deciding that the reservation boundaries were nonetheless altered, the Court considered that "fewer than 10 percent" of the original reservation lands remained "in Indian hands" and that "non-Indians constitute over two-thirds of the population" within the original reservation. Id. at 356. Other cases have also considered these subsequent demographics in addition to the language of the instrument and its contemporaneous history. See, e.g., Hagen, 510 U.S. at 421 (explaining that 85 percent non-Indian demographics and longstanding assertion of state jurisdiction over area "demonstrate[] a practical acknowledgment that the Reservation was diminished"); Rosebud Sioux, 430 U.S. at 604-05 (discussing "justifiable expectations" created in an area over 90 percent non-Indian in both population and land statistics).

Since this appeal was argued, the Supreme Court has decided City of

(continued...)

the "least compelling," Yankton Sioux, 522 U.S. at 356, and will not substitute for failure of the instrument's language or contemporaneous history to evidence an intention to terminate all or some of the reservation. See Pittsburg, 909 F.2d at 1395-96 (citing Solem, 465 U.S. at 472).

## B.    Application

At the outset, the Shawnee argue that the effect of the 1854 Treaty on their reservation's status has already been decided in their favor by prior Supreme Court and Tenth Circuit cases. However, we have carefully reviewed each of their cited cases and conclude that none of them definitively decided the question presented in this appeal—that is, whether the 1854 Treaty reserved or created a reservation for the Shawnee or instead left the Shawnee with jurisdiction only over their retained allotments.[24] Therefore, we must analyze the Treaty directly in

---

[23](...continued)
Sherrill v. Oneida Indian Nation, 125 S.Ct. 1478, 1482-83 (2005). We do not address this recent case as the parties have not argued its relevance.

[24]The cases the Shawnee rely on most heavily include The Kansas Indians, 72 U.S. (5 Wall.) 737 (1866); Walker v. Henshaw, 83 U.S. (16 Wall.) 436, 443 (1872); United States v. Ward, 28 F.Cas. 397, 399 (1863); and Oyler v. Allenbrand, 23 F.3d 292 (10th Cir. 1994). Although admittedly some of these cases use broad or imprecise language, none of them hold that the Shawnees necessarily retained a "reservation" in the legal sense of the word.
In Kansas Indians, the Supreme Court addressed "whether the lands belonging to the united tribe of Shawnee Indians, residing in Kansas, are taxable." 72 U.S. at 751. The Court held that states have no power to tax Indian lands, whether held tribally or individually, as long as the tribal government is recognized by the United States. Id. at 757. On appeal, the Shawnee argue this
(continued...)

[24](...continued)

result depended on the Court determining Shawnee lands were still a "reservation." However, in Solem, the Court noted that in the mid-Nineteenth Century, when Kansas Indians was decided, "Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest" and the "notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar." 465 U.S. at 468. The issue in Kansas Indians was confined to the state's authority over lands that Indians actually owned; therefore, the issue of reservation status apart from title concerns was simply not decided. See also Absentee Shawnee, 862 F.2d at 1422 n.5 (describing Kansas Indians as holding that "the lands that the Shawnees selected and continued to own were held to be Indian lands which were exempt from taxation") (citing Kansas Indians, 72 U.S. at 760-61) (emphasis added)); City of Sherrill, 125 S.Ct. at 1491 n.10 (recognizing Kansas Indians as a case "concern[ing] land the Indians had continuously occupied" and specifically "concerning Indians removed to and residing on Kansas lands before statehood").

Walker is similarly unhelpful to the Shawnee. There, the Court considered a non-Indian's claim to land in the 200,000-acre re-ceded portion that arose immediately after the 1854 Treaty and while the Shawnee's right to select individual allotments in this area remained open. 83 U.S. at 443. The Walker Court held that the Shawnee "did not part with any right in the [200,000 acres] reserved by them as long as the claim of any single member of the tribe . . . was unsatisfied." Id. (emphasis added). This simply enforced Article V of the 1854 Treaty, which protected the Shawnee's right of selection by providing that "no white persons or citizens shall be permitted to make locations or settlements within [the 200,000 acres], until after . . . the Shawnees shall have made their selections and locations, and the President shall have set apart the surplus." 1854 Treaty, Art. 5. Indeed, we have interpreted Walker to suggest that after 1858, when the President declared the unallotted lands open for settlement as "public lands," any remaining non-title rights were extinguished. See Absentee Shawnee, 862 F.2d at 1422 (citing Walker, 83 U.S. at 445-46).

Finally, the Shawnee's reliance on both Ward and Oyler is misplaced. Ward mentions the Shawnees and their 1831 Treaty in dicta only as a point of contrast to the Kansas Indians' situation before the Court. 28 F.Cas. at 399. Similarly, our opinion in Oyler merely held that the Kansas Act, which conferred jurisdiction to Kansas "over offenses committed by or against Indians or Indian reservations, including trust or restricted allotments," 18 U.S.C. § 3243, gave Kansas jurisdiction to prosecute a Shawnee tribal member for conduct occurring

(continued...)

this case.

The 1854 Treaty's multi-step transaction is unique. First, the Shawnee agreed to "hereby cede and convey to the United States" their entire 1.6 million acre "tract of country . . . which was designated and set apart for the Shawnees" in their earlier treaties. 1854 Treaty, Art. 1. In exchange, the United States promised to "to pay to the Shawnee people the sum of eight hundred and twenty-nine thousand dollars." Id. at Art. 3. In addition, the United States provided that it would "hereby cede to the Shawnee Indians two hundred thousand acres of land" from which individuals could "select" discrete 200-acre tracts.[25] Id. at Art. 2. After the time passed for absent Shawnee to return and claim an entitlement to one of these allotments, the Treaty provided that all unassigned lands "shall be sold" with "the proceeds of such sales" to be applied for "such

_____

[24](...continued)
on allotted land despite any guarantees of criminal jurisdiction that may have been made in the Shawnee's 1831 Treaty. 23 F.3d at 298-99. Our statement in dicta that we found "no evidence" that the Shawnee's 1831 Treaty had been abrogated is certainly not controlling on the question of the effect of the 1854 Treaty, which was not discussed or relied upon in Olyer whatsoever. Id. at 295.

[25]In fact, the Shawnees' right to select these 200 acres did not extend to the entire 200,000 acres. Instead, they were entitled to select from the residue of the 200,000-acre area left after the United States made several specific conveyances to various schools and churches. 1854 Treaty, Art. 2. In addition, Shawnees who resided outside the 200,000-acre area at the time of the Treaty were entitled to take their 200-acre allotments in that exterior area instead. Id.

- 38 -

beneficial or benevolent objects among the Shawnees, as the President of the United States, after consulting with the Shawnee council, shall determine." Id.

These 200,000 acres governed by Article 2 are the source of the instant dispute. The Tribe argues Article 2 either reserved a 200,000-acre reservation for the Shawnee or created a new reservation of the same size. Although this is a difficult question, we ultimately disagree. Article 2 provided tribal members, and other designated individuals and entities, a temporary right to select individual lots of property. However, it did not preserve or create territorial boundaries in the form of a tribal reservation. Instead, the entire 1.6 million acres lost their reservation status when the Shawnee conveyed them to the United States.

### 1.    Language and structure of 1854 Treaty

The 1854 Treaty matches closely the Supreme Court's test for an "almost insurmountable presumption" that the reservation has been diminished or terminated. See Solem, 465 U.S. at 470-71. There is "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests [which] strongly suggests that Congress meant to divest from the reservation all unalloted opened lands." Id. at 470. Here, the tribe agreed to "cede and convey" all of their 1.6 million acre reservation to the United States. 1854 Treaty, Art. 1. This is certainly a "total surrender" of their reservation lands.

- 39 -

The second half of the equation—that the "language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land"—is also met here. See Solem, 465 U.S. at 470. In turn for surrendering their reservation, the tribe received "[i]n consideration of the cession and sale herein made" a sum certain payment of $829,000. 1854 Treaty, Art. 3. In addition, the United States gave individual tribal members the right to select discrete 200-acre parcels from within an approximately 200,000-acre area. Id., Art. 2. What land remained after these selections were made was ultimately "declared to be public lands," Walker, 83 U.S. at 446 (interpreting Proclamation of the President, July 9, 1858), and sold with the proceeds held by the United States for the benefit of the Shawnees.[26]

---

[26]We previously explained, albeit in dicta, that the restoration to the public domain of these unassigned lands

> extinguished the Shawnees' rights in land unclaimed by members of their tribe. See Walker, 83 U.S. at 445-46. When the President set apart the lands unclaimed by the Shawnees and opened such lands to preemption and settlement pursuant to articles 2 and 5 of the 1854 Treaty, such lands were "declared to be *public lands*." Id. at 446 (emphasis added.).

Absentee Shawnee, 862 F.2d at 1422.
      This also comports with the Tribe's own agreement, pursuant to Article 2, that it would "cede, relinquish, and convey to the United States, all tracts or parcels of land which may be sold, and are required to be sold in pursuance of any article of this instrument." 1854 Treaty, Art. 2.

Before this court, the Shawnee argue that in Article 2 the United States agreed to "cede" back 200,000 acres to the Shawnee and that this served to establish, or re-establish, full tribal territorial sovereignty in the whole of the 200,000-acre territory. We see the appeal of this argument given that the term "cession" does generally refer to "a voluntary surrender of territory or jurisdiction." Rosebud Sioux, 430 U.S. at 597. However, we must look to the Treaty as a whole and in its entirety the 1854 Treaty makes clear the United States did not give a total surrender of all its rights and interests in these 200,000 acres to the Shawnee as a tribe.[27]

First, the Shawnee did not retain or receive the entire 200,000 acres. As noted, Article 2 provides first for the transfer of some of this land to certain schools and churches. 1854 Treaty, Art. 2. Our court, considering one of these very transfers, held that this property passing from the United States to the specific named entities was "public land" because the Shawnees' rights after the 1854 Treaty were limited to the properties they had actually selected. Absentee Shawnee, 862 F.2d at 1419, 1422-23.

In addition, we are struck by the fact that, under Article 2, the Shawnee received only individual rights to select discrete, and potentially scattered,

---

[27]See, e.g., 1854 Treat, Art. 9 (providing for Congress to issue patents to individual Shawnee who made selections pursuant to Article 2 "with such guards and restrictions as may seem advisable for their protection therein").

individual plots.[28]  Although scattered ownership itself certainly does not lead to a

conclusion of termination, see Solem, 465 U.S. at 469, we are cognizant that a

reservation is created—or for that matter retained—when "from what has been

done there results a certain defined tract appropriated for certain purposes."

Minnesota v. Hitchock, 185 U.S. 373, 389-90 (1902).  There was no "set apart" of

a reservation—or territorial boundaries—in this Treaty.

Finally, we note that the unassigned lands, once they were opened for non-

Indian settlement in 1858, were "declared to be public lands."  Walker, 83 U.S. at

446 (interpreting Proclamation of the President, July 9, 1858).  This parallels the

situation in Pittsburg, where a reservation addition made for the purpose of

making individual allotments (albeit in an area that was not within the original

reservation) was terminated in its entirely after its unallotted portions were

restored to the public domain.[29]  See 909 F.2d at 1420.

---

[28]Although the Treaty provides for the "number of Shawnees who desire[d]
to hold their lands in common," even these "in common" assignments were
actually "set off . . . in a compact body . . . equal to two hundred acres to every
individual in each of said communities."  1854 Treaty, Art. 2.

[29]The Tribe also argues that the 1854 Treaty must be read to preserve or
create a 200,000-acre reservation because any other interpretation would (1)
violate the 1831 Treaty's promise of perpetual protection for the Tribe's lands and
(2) result in the Tribe receiving no compensation for the sovereignty lost.
    As for the 1831 Treaty, the Government points out that the 1854 Treaty
includes a $29,000 payment "in full satisfaction, not only of such claim [for
damage to crops and stock caused by 'the great emigration which has for several
years passed through their country'], but of all others of what kind soever, and in
(continued...)

- 42 -

## 2. Surrounding circumstances and history

Although this "most probative" evidence from the face of this 1854 Treaty convinces us of a mutual intent of both the Shawnee and the United States to terminate the Shawnee's reservation status, leaving the Shawnee with jurisdiction only over their retained properties, for the sake of completeness we consider the surrounding circumstances and history of this Treaty.

The Treaty was negotiated pursuant to specific Congressional direction that negotiations be had "for the purpose of 'securing the assent of said tribes to the settlement of the citizens of the United States upon the lands claimed by said

[29](...continued)
release of all demands and stipulations arising under former treaties, with the exception of the perpetual annuities [which represent payments for ceded lands over time]." 1854 Treaty, Art. 11. We do not necessarily find this language persuasive as an express abrogation of the 1831 Treaty (especially considering ejusdem generis and that damages seem to have been paid for individuals' claims); however, the Supreme Court has not hesitated in any of its diminishment cases to find reservation boundaries altered despite prior promises of protection in perpetuity. E.g., Yankton Sioux, 522 U.S. at 337 n.1, 357-58 (diminishing reservation despite savings clause in treaty in question).

Finally, as for the compensation issue, the Shawnee argue its "sum certain" payment of $829,000 was only for the 1.4 million acres unaffected by Article 2, and the Indian Claims Commission previously assumed as much. However, in addition to the $829,000, the Tribe also received the right to have its members select 200-acre tracts for individual ownership and to receive the proceeds from the ultimate sale of what portion of the 200,000 acres were not ultimately allotted. Even in DeCoteau, where the entire reservation was terminated, the affected tribe received a sum certain payment only for that portion of the original reservation that was unallotted. 420 U.S. at 445. Moreover, in Rosebud Sioux, the Court held that receiving proceeds from the sale of land that was "ceded" could still support a finding of diminishment. 430 U.S. at 588.

- 43 -

Indians, and for the purpose of extinguishing the title of said Indians in whole or in part to said lands.'" Absentee Shawnee, 862 F.2d at 1417 n.2 (quoting Act of March 3, 1853, ch. 104, 10 Stat. 226, 238) (further quotation omitted). These negotiations failed in their first attempt because the tribe desired to retain portions of their land and specifically "proposed to sell the United States one million of [sic] acres, reserving to themselves six hundred thousand (600,000) acres adjoining the State of Missouri." Id. (quotation omitted).

The fact that such a reservation was not acceptable to the United States, and that the Shawnee ultimately acquiesced to the 1854 Treaty in the second attempt, is telling.[30] Moreover, we note that the 1854 Treaty as originally drafted would have provided for a more straightforward cession of the Shawnee's 1.6

_____

[30]The Shawnee do, however, point us to some historical records from this second negotiation attempt that do give some indications that the Shawnee, even then, sought to retain at least a portion of their reservation lands. Specifically, the Shawnee cite to references in Manypenny's reports to Congress addressing all of the Kansas tribes collectively with references that "[w]hen they did consent to sell, it was only on the condition that each tribe should retain a portion of their tract as a permanent home." Manypenny also said neither side in the negotiations "sought to change the guarantees and stipulations of former treaties." However, again, these are all general comments about the Kansas tribes collectively.

In addition, the Shawnee cite to a reference in the 1854 Treaty negotiations that suggest the Shawnee and Manypenny discussed creating "a boundary to keep off the whites," and to several subsequent—but failed—attempts by the United States to ratify a later treaty with the Shawnee in the 1860's that would have removed the Shawnee from Kansas entirely. All these historical references in isolation do give us pause as they may indicate a contrary intent on the part of the Shawnee. However, when we ultimately look to the entire picture of this 1854 transaction, we are convinced the reservation was terminated.

million acre reservation "[e]xcepting and reserving therefrom two hundred thousand acres for homes for the Shawnee people, which said two hundred thousand acres is retained, as well for the benefit of those Shawnees, parties to the treaty of August 8th, 1831, as for those parties to the treaty of November 7, 1825." 1854 Treaty, amendments. However, a *mutually agreed-upon* amendment struck that language and, in its place, created the two-step language and structure found in the final version of the treaty. Id. This amendment was twice discussed and agreed to by the Tribe. Id.

The Shawnee emphasize that the Amendment creating the two-step structure of "cede and re-cede" had the exact same, on-the-ground effect for the Shawnee at the time of negotiation. They argue this amended version should not be interpreted against the Shawnee, who could not have understood the legal ramifications of such linguistic nuances.[31] However, we may not ignore the plain language of the instrument that "viewed in historical context and given a 'fair

---

[31]The Shawnee also emphasize the use of the phrase "reserved" to describe the 200,000 acres in some references in Article 2, and argue this at least creates an ambiguity that must be interpreted in favor of the Indians. In response to the emphasis on the term "reserved," the Government quotes Pittsburg, 909 F.2d at 1409, where we said: "paradoxical references [by Interior officials] to the area as reservation must be heavily discounted as convenient colloquialisms." Indeed, we agree with the Government that our focus must be the operative language of the Treaty. See id. at 1395.

appraisal,' clearly runs counter to a tribe's later claims." <u>Absentee Shawnee</u>, 862

F.2d at 1418 (quotation omitted).

### 3.    Subsequent indicators as evidence of intent

Finally, we consider the third <u>Solem</u> factor—what we can infer about the

parties' intents from their subsequent actions.[32]  At first blush, this last prong

appears to cut against the Shawnee given that in 1869, just fifteen years after the

1854 Treaty, the Shawnee apparently abandoned Kansas and negotiated an

agreement with the Cherokee Nation in Oklahoma.  Pursuant to this formal

agreement, approved by the President, the Shawnees committed to be

"incorporated into and ever remain a part of the Cherokee Nation," and further

agreed "that the said Shawnees shall abandon their tribal organization" and turn

over annuities owed them by the United States to the Cherokee.[33]

---

[32]Although the Shawnee's brief suggests that "numerous Shawnee restricted allotments continue to be owned by tribal members" in the area, the affidavit they cite for support of this establishes only that the Tribe's "Chief and Chairman," Ronald G. Sparkman, is "an owner of Shawnee Reserve No. 206" two miles from the Sunflower Plant and that he has "a relative, Jimmie D. Oyler, that presently lives on part of the Shawnee Reservation near the Sunflower Army Ammunition Plant."  This seems to suggest the contrary—a minimal presence.

[33]The Shawnee point out that this 1869 Agreement was recently abrogated when, on December 27, 2000, Congress restored the Shawnee Tribe's "current and historical responsibilities, jurisdiction, and sovereignty as it relates to the Shawnee Tribe, the Cherokee-Shawnee people, <u>and their properties</u> everywhere." 25 U.S.C. § 1041(3) (2001) (emphasis added).  While Congress and the President recognized that the Shawnee Tribe "from and after its incorporation and its merger with the Cherokee Nation has continued to maintain the Shawnee Tribe's

(continued...)

We cannot conclude, however, on the basis of the record before us that the Shawnee chose to leave Kansas freely. The record reveals that at least some of the Shawnee abandoned or sold their allotments because they could not protect their property from the encroachment of western settlers. The Shawnee's desire to live with the Cherokee also appears to have been motivated, at least in part, by the futility of their efforts to defend their land. Because the record does not resolve to what extent the Shawnee left their homes in Kansas freely or under duress, we conclude the final <u>Solem</u> factor favors neither party. Our conclusion that the Shawnee reservation in Kansas was terminated remains the same nevertheless because the first two <u>Solem</u> factors will overcome an ambiguous resolution of the third.

## CONCLUSION

We VACATE the district court's judgment as to the APA claims but AFFIRM as to the remaining non-APA claims on the basis that the reservation has been extinguished. We REMAND for any further action as may be necessary consistent with this opinion.

---

[33](...continued)
separate culture, language, religion, and organization, and a separate membership roll," <u>id.</u> § 1041(2), it made no mention of any retained reservation whatsoever. Instead, it specifically references only "properties."

**LUCERO**, Circuit Judge, concurring.

Because of concerns over the majority's separation of powers analysis, I solely concur in the result.